## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| IN RE: ) | CASE NO. | 13-51186 (JJT) |
| ) | | |
| JIE XIAO, ) | CHAPTER | 7 |
|     DEBTOR. ) | | |
| ) | | |
| RONALD I. CHORCHES,  TRUSTEE, ) | ADV. PRO. NO. | 14-05019 (JJT) |
| OF JIE XIAO, ) | | |
|     PLAINTIFF ) | RE: ECF NOS. | 125, 267, 268, 269, |
| ) | | 270 |
| V. ) | | |
| ) | | |
| XIN CHEN, ) | | |
|     DEFENDANT. ) | | |
| DOW CORNING CORPORATION AND ) | ADV. PRO. NO. | 14-05054 (JJT) |
| HEMLOCK SEMICONDUCTOR ) | | |
| CORPORATION, ) | RE: ECF NOS. | 155, 267, 268, 269 |
|     PLAINTIFFS ) | | |
| ) | | |
| V. ) | | |
| ) | | |
| JIE XIAO, ) | | |
|     DEFENDANT. ) | | |

## POST-TRIAL MEMORANDUM OF DECISION

### APPEARANCES

Brian K. Condon, Esq.                             Attorneys for Xin Chen
Laura M. Catina, Esq.
Condon & Associates, PLLC
55 Old Turnpike Road, Suite 502
Nanuet, NY 10954-2461

Ronald Chorches, Esq.                             Attorneys for Ronald I. Chorches, Trustee
David T. Austin, Esq.
Marjorie Gruszkiewicz, Esq.
Law Offices of Ronald I. Chorches, LLC
449 Silas Deane Highway, 2nd Floor
Wethersfield, CT 06109-2120

Eric S. Goldstein, Esq.                          Attorneys for Dow Corning Corporation and
Alex Hwang, Esq.                                 Hemlock Semiconductor Corporation
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919

Luis Medina, Esq.                                Attorney for Jie Xiao
Law Offices of Luis Medina
524 Winchester Road
Norfolk, CT 06058-1364

I.    INTRODUCTION

The Court heard these matters in a combined trial of an Adversary Proceeding alleging

fraudulent transfers ("Chen AP," Adv. Pro. No. 14-05019 (JJT)) and a related Adversary

Proceeding objecting to the discharge of the Chapter 7 debtor, Jie Xiao (hereinafter, "Debtor")

("Dow AP," Adv. Pro. No. 14-05054 (JJT)).[1]

The Debtor filed this Chapter 7 bankruptcy petition (ECF No. 2, Case No. 13-51186) on

July 30, 2013 ("Petition Date"). At the time, the Debtor had recently divorced his wife of 21 years,

Xin Chen (hereinafter, "Ms. Chen"). Through their July 3, 2013 divorce judgment, the Debtor

made multiple financial transfers totaling over $1 million to Ms. Chen, less than one month before

the Petition Date.

On April 8, 2014, Ronald I. Chorches ("Chapter 7 Trustee") initiated the Chen AP, and on

June 12, 2014, he filed the Amended Complaint ("Chen Complaint," ECF No. 31, Adv. Pro. No.

14-05019) against Ms. Chen raising five avoidance counts: (1) intentional fraudulent conveyance

pursuant to 11 U.S.C. § 548(a)(1)(A); (2) constructive fraudulent conveyance pursuant to 11

U.S.C. § 548(a)(1)(B); (3) unjust enrichment; (4) turnover pursuant to 11 U.S.C. § 542; and (5)

---

[1] Documents will be referred to throughout the opinion by their ECF numbers. The present Adversary Proceedings were partially consolidated for trial with *Coan v. Chen* (Adv. Pro. No. 15-05027 (JJT)) in the underlying Chapter 7 bankruptcy case of *In re LXEng LLC* (Case No. 13-51144 (JJT)). All referenced ECF numbers are docketed in the Dow AP, unless otherwise indicated.

preferential transfer pursuant to 11 U.S.C. § 547(b).[2] The Chapter 7 Trustee seeks, *inter alia*, to avoid $986,581.33 in asset transfers that occurred pursuant to the divorce judgment ("Transfers") and impose a constructive trust over the Transfers. Ms. Chen filed an Amended Answer[3] in response thereto (ECF No. 71, Case No. 14-05019), largely denying the Chen Complaint's allegations and asserting five affirmative defenses: (1) failure to state a claim for relief; (2) that the transfers were for value and in good faith; (3) that the transfers constitute a property settlement in the parties' dissolution; (4) the lack of actual or constructive knowledge of the alleged fraud; and (5) that the payments were bona fide and made for domestic support obligations.

In the Dow AP, Dow Corning Corporation and Hemlock Semiconductor Corporation (collectively, "Dow") filed the Complaint Objecting to Discharge ("Dow Complaint," ECF No. 1) against the Debtor on September 10, 2014. Dow objects to the Debtor's discharge in three related counts under 11 U.S.C. §§ 727(a)(2)(A), (a)(3), and (a)(5). The Debtor interposed an Answer (ECF No. 27) denying the allegations in the Dow Complaint without asserting any affirmative defenses.

II.    PROCEDURAL HISTORY

To begin, delay tactics and deception are part and parcel of the shared litigation techniques and strategy of the Debtor and Ms. Chen. By Order dated May 18, 2015 ("Consolidation Order," ECF No. 67), the Court (Shiff, J.) granted Dow's Motion to Consolidate the Dow AP and the Chen AP for Trial. The Consolidation Order combined Dow's 11 U.S.C. § 727(a)(2)(A) claim in the Dow AP and the Chapter 7 Trustee's 11 U.S.C. § 548(a)(1)(A) claim in the Chen AP for trial. The Court stayed the remaining claims pending the outcome of the consolidated matter. All of the parties submitted a Joint Stipulation of Undisputed Facts and Exhibits for use in the consolidated

---

[2] The Chapter 7 Trustee amended the original Complaint (ECF No. 1, Adv. Pro. No. 14-05019) to correct Scrivener's errors.

[3] The Amended Answer simply added a fifth affirmative defense. Other than that, Ms. Chen made no other changes to the original Answer that she filed (ECF No. 38, Adv. Pro. No. 14-05019).

trial (ECF No. 155). The Court accordingly heard the evidence in the consolidated trial of the Dow AP and the Chen AP and constructed the common record upon which this Decision relies.

At the status conference held on February 21, 2017, the Chapter 7 Trustee informed the Court that he learned that Ms. Chen transferred $1.35 million to China—substantially all of her liquid assets from the Divorce Action—*a day after the Chen AP commenced*. In response, on March 2, 2017, the Chapter 7 Trustee filed an Amended Motion for Preliminary Injunction (ECF No. 119, Adv. Pro. No. 14-05019) against Ms. Chen asking this Court to compel Ms. Chen to return the $1.35 million that she transferred to China. Ms. Chen unabashedly objected (ECF No. 129, Adv. Pro. No. 14-05019). The objection led to insight on the $1.35 million transfer, which Ms. Chen admittedly did to protect her money and avoid a putative creditor.

Shortly thereafter, on March 24, 2017, both Ms. Chen (ECF No. 148, Adv. Pro. No. 14-05019) and the Debtor (ECF No. 161) asked this Court to recuse itself for perceived bias and prejudice. The Court denied both recusal motions on March 31, 2017 (ECF No. 165, Adv. Pro. No. 14-05019; ECF No. 170) with accompanying rulings on April 5, 2017 (ECF No. 176, Adv. Pro. No. 14-05019; ECF No. 178). Ms. Chen filed a petition for writ of mandamus in the District Court, requesting the recusal of this Court from all pending matters related to her. The District Court denied the petition, and the Second Circuit Court of Appeals affirmed by summary order. *In re Chen*, 2017 WL 1399631 (D. Conn. Apr. 18, 2017), *aff'd sub nom. Chen v. Chorches*, 712 F. App'x 73 (2d Cir. 2018).

On May 15, 2017, after notice and hearings, this Court issued its Ruling on the Motion for Preliminary Injunction ("Preliminary Injunction Ruling," ECF No. 224, Adv. Pro. No. 14-05019), requiring Ms. Chen to repatriate the $1.35 million that she transferred to China between April 21 and May 12, 2014 (after the Chapter 7 Trustee initiated the Chen AP) into a United States bank

account within 15 days and freezing assets under the direct control of Ms. Chen worth up to $209,299.65. Pursuant to the Preliminary Injunction Ruling, the Court ordered Ms. Chen to file a Certificate of Compliance, under oath, stating the amount returned and the identity of the bank and account in which she held the money, so that the Chapter 7 Trustee might obtain a supplemental prejudgment remedy order to attach to the money.

Ms. Chen appealed the Preliminary Injunction Ruling to the District Court ("Appeal of the Preliminary Injunction," ECF No. 235, Adv. Pro. No. 14-05019) and moved for relief from the Preliminary Injunction Ruling (ECF Nos. 236, 238, Adv. Pro. No. 14-05019). While Ms. Chen filed a Certificate of Partial Compliance regarding the frozen assets, she never filed a Certificate of Compliance regarding the return of the $1.35 million she sent abroad, which she claimed was outside of her control. *See* ECF No. 236, Adv. Pro. No. 14-05019. After notice and a hearing, the Court issued a preliminary decision on June 22, 2017 (ECF No. 244, Adv. Pro. No. 14-05019) directing Ms. Chen to make diligent efforts to account for and repatriate the $1.35 million. As to its earlier Preliminary Injunction Ruling, the Court reserved decision on the sufficiency of Ms. Chen's compliance efforts, postponing its determination on the issue and possible sanctions until the completion of this trial (ECF No. 244, Adv. Pro. No. 14-05019). It issued a ruling on June 24, 2017 (ECF No. 245, Adv. Pro. No. 14-05019) finding that Ms. Chen failed to demonstrate good and sufficient cause for relief from the asset freeze and failed to comply with the Preliminary Injunction Ruling. Again, Ms. Chen filed a Motion for Relief from Judgment on the Preliminary Injunction Ruling (ECF No. 248, Adv. Pro. No. 14-05019), which was later withdrawn on July 31, 2017 (ECF No. 264, Adv. Pro. No. 14-05019).

The Court held seven days of trial on these matters,[4] which included testimony from six witnesses, including the Debtor and Ms. Chen. Following the trial and oral arguments, Dow and the Chapter 7 Trustee (collectively, "Plaintiffs") filed their Proposed Findings of Fact and Post-Trial Brief (ECF No. 267) requesting that the Court: (1) determine that the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(2)(A); (2) avoid and order the return of $986,581.33[5] in Transfers to the Chapter 7 bankruptcy estate under 11 U.S.C. §§ 548(a)(1)(A) and 550; and (3) order such additional relief as justice requires. The Debtor submitted his Proposed Findings of Fact and Conclusions of Law (ECF No. 268) arguing, *inter alia*, that Dow failed to demonstrate the requisite intent to render his debt nondischargeable under 11 U.S.C. § 727(a)(2)(A). Ms. Chen submitted her Post-Trial Brief (ECF No. 268, Adv. Pro. No. 14-05019). In its Reply to the Debtor's Post-Trial Brief (ECF No. 269), Dow reiterates its arguments entitling it to judgment in its favor. Ms. Chen filed a Post-Trial Reply Brief (ECF No. 269, Adv. Pro. No. 14-05019), and the Chapter 7 Trustee filed a Reply to Ms. Chen's Post-Trial Brief (ECF No. 270, Adv. Pro. No. 14-05019).

The District Court dismissed the Appeal on the Preliminary Injunction on June 25, 2018 because it sat pending at the District Court for over six months without Ms. Chen ever filing a brief in support of her Appeal (ECF No. 288, Adv. Pro. No. 14-05019).

During the pendency of the appeals, this matter remained under advisement. For the reasons stated, the Court now enters judgment in favor of the Plaintiffs as delineated herein.

---

[4] Although the trial occurred separately from the hearing on the preliminary injunction, the hearings and record on the Preliminary Injunction Ruling are incorporated into the trial record. *See* Fed. R. Civ. P. 65(a)(2) (evidence admitted during a hearing on a preliminary injunction becomes part of the trial record and need not be reintroduced at trial).

[5] Alternatively, the Plaintiffs asked for turnover of $1,191,817.33 if the Debtor's pension plan ("Pension Plan") was exempt from his bankruptcy estate. In its Post Trial Ruling on Claimed Pension Exemption ("Pension Plan Ruling," ECF No. 557, Case No. 13-51186), this Court held that the Pension Plan is not exempt from the Debtor's Chapter 7 bankruptcy estate, resulting in the requested $986,581.33 figure.

III.    BACKGROUND

The Debtor and Ms. Chen have an extensive history of lawsuits in both state and federal courts, spanning from the Eastern District of Michigan[6] to the New Jersey Family Court[7] to this Court. Their historied presence in courtrooms and in cases that materially affect this bankruptcy litigation began over ten years ago; those proceedings, indicative of a sustained pattern of irregular or suspect transfers by the Debtor, are hereinafter summarized chronologically, along with the facts that are material to the avoidance claims herein.

On January 16, 2009, Kathy Little ("Mrs. Little") filed a civil complaint against the Debtor and LXEng, LLC ("LXEng") in the United States District Court for the District of New Jersey ("Little Action").[8] Mrs. Little sought the value of her deceased husband's 50% ownership interest in LXEng pursuant to a "Termination Put" option in the LLC's operating agreement. The parties reached a settlement agreement in April 2012,[9] whereunder the Debtor and LXEng agreed to pay Mrs. Little $1.5 million—an obligation that they have yet to fulfill.

On December 1, 2009, the Debtor and LXE Solar Inc. ("LSI") filed a complaint against the Republic of Seychelles, among others, in the United States District Court for the Southern District of New York ("Seychelles Action") to recover over $8.5 million that the country froze in the Debtor's offshore bank account for alleged illegal activity.[10] They alleged 26 counts in their complaint, including, *inter alia*: violations of the Alien Tort Claims Act and Federal Computer Fraud and Abuse Act; theft and conversion; unjust enrichment; common law fraud; tortious interference; breach of fiduciary duty; conspiracy; aiding and abetting intentional tortious conduct;

---

[6] *Dow Corning Corp. v. Xiao*, Civil Action No. 1:11-cv-10008-TLL-CEB (E.D. Mich.).
[7] *See Chen v. Xiao*, Docket No. FM-14-1522-13, Superior Court of New Jersey, Chancery Division, Family Part of Morris County.
[8] *Little v. Xiao*, Civil Action No. 2:09-cv-00260-PGS-ES (D.N.J.).
[9] The date of the Mediation Settlement Agreement was left blank and states "April ___, 2012."
[10] *Xiao v. Seychelles*, Civil Action No. 1:09-CV-09845-LTS (S.D.N.Y.).

and misappropriation of trade secrets. Three weeks later, the Debtor and LSI voluntarily dismissed the case, pursuant to Fed. R. Civ. P 41(a)(1)(A)(i), before any party had filed responsive papers.

On January 3, 2011, Dow commenced an action ("Dow Action") against the Debtor, LSI, and LXEng in the United States District Court for the Eastern District of Michigan for misappropriation and use of trade secrets, trademark infringement, false advertising, false representations, unfair competition, trademark dilution, and tortious interference with contract.[11] Dow was principally concerned with LXEng's appropriation of intellectual property allegedly stolen by Mr. Little and used for both LXEng's and the Debtor's benefit and profit.

On June 12, 2013, Ms. Chen filed for divorce from the Debtor ("Divorce Action") in the Superior Court of New Jersey ("Superior Court").[12] Shortly thereafter, the Superior Court entered a Judgment of Divorce ("Divorce Judgment") on July 3, 2013. At the parties' urging, the Superior Court simultaneously approved a property settlement agreement ("PSA") along with the Divorce Judgment, transferring substantially all of the couple's liquid assets to Ms. Chen. However, the Superior Court resisted the parties' anomalous requests to seal their divorce file. After consulting with her legal counsel, Ms. Chen transmitted substantial sums of money to her parents in China to allegedly fund their medical treatments for unspecified cancer conditions.

Less than a month later, on July 30, 2013 ("Petition Date"), on the verge of a default judgment in the Dow Action, the Debtor filed a voluntary petition for bankruptcy protection and relief under Chapter 7 of the United States Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut. The Chapter 7 Trustee was appointed by August 2013 to represent the Debtor's Chapter 7 bankruptcy estate and protect the Debtor's unsecured creditors. The Debtor laid out his assets in his Amended Schedule B (ECF No. 27, Case

---

[11] *See* note 6 of this Decision.
[12] *See* note 7 of this Decision.

No. 13-51186). The Debtor's Schedule F (ECF No. 12, Case No. 13-51186) reveals that he had nearly $1 million in his stated general unsecured debt on the Petition Date without factoring in Dow's disputed and unliquidated litigation claims.

On October 23, 2013, the District Court in the Dow Action entered a default judgment against LSI, LXE Solar Ltd., and another defendant. On January 10, 2014, after Dow received relief from the automatic stay imposed by LXEng's underlying Chapter 7 bankruptcy case, the District Court entered a default judgment against LXEng, enjoining it from using or selling Dow's technology and holding in abeyance Dow's request for disgorgement of $15.7 million, leaving only the case against the Debtor pending.[13]

## IV.    JURISDICTION

The Court possesses jurisdiction over these Adversary Proceedings pursuant to 28 U.S.C. § 1334(b) and may hear and determine these matters pursuant to the District Court's General Order of Reference dated September 21, 1984. The parties do not contest the venue, which is proper under 28 U.S.C. § 1409(a). As counsel agreed in the Trial Management Order (ECF No. 218), these issues are core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (H), (I), and (O), and the parties consent to the Court entering final judgment in both the Dow AP and the Chen AP.

## V.    FINDINGS OF FACT

The trial on the merits of this case spanned over seven days, including extensive witness testimony.[14] Jonathan Molloy testified on May 16, 2017 regarding the Dow Action; Cary Cheifetz ("Mr. Cheifetz") testified on May 16 and 17, 2017 regarding the division of assets in the Divorce Action; Richard Finkel ("Mr. Finkel") testified on May 19, 2017 regarding the Debtor's assets,

---

[13] The Dow Action is currently stayed and administratively closed due to the Debtor's Chapter 7 bankruptcy filing but may be reopened if Dow obtains relief from the automatic stay in the Debtor's underlying bankruptcy case to liquidate its claim.

[14] These witnesses were in addition to those that testified at the preliminary injunction hearing.

liabilities, and overall insolvency both before and after the Divorce Action; Judge Thomas Zampino ("Judge Zampino") testified on May 24, 2017 as an expert witness on property settlement agreements under New Jersey domestic relations law; the Debtor testified on June 27 and July 5, 2017, and Ms. Chen testified on June 30, 2017. Pursuant to Fed. R. Civ. P. 52, incorporated by Fed. R. Bankr. P. 7052, after considering the trial evidence and arguments, including those related to the hearing on the Preliminary Injunction Ruling, this Court makes the following Findings of Fact to supplement those advanced in the Introduction, Background, and Procedural History of this Decision:

A. The Debtor and Ms. Chen's Personal History

1. The Debtor and Ms. Chen married in 1992 and have two children together: a son born in 1996 and a daughter born in 1999. J. Stip. 2; Tr. 5, ECF No. 254.

2. Since 2000, Ms. Chen has continuously lived at 18 Parkview Road in Randolph, New Jersey ("Marital Home"). Tr. 4, ECF No. 253.

3. The Debtor received his bachelor's degree from Shanghai Jiao Tong University and later his Ph.D. in chemistry from the University of Michigan in 1996. J. Stip. 2.

4. Ms. Chen received her bachelor's degree from Shanghai Jiao Tong University and her master's degree in analytical chemistry from the University of Michigan in 1996. *Id.*; Tr. 5, ECF No. 253. She was a Ph.D. candidate at the University of Michigan and passed her qualifications, but she did not complete her doctoral degree program. Tr. 8, ECF No. 253.

5. After graduation, Ms. Chen worked as a chemist at Merck & Company, Inc. ("Merck") for four years and then worked at Novartis International AG ("Novartis") from 2000 through 2016. J. Stip. 2. During Ms. Chen's employment, she earned roughly $100,000.00 annually. Tr. 68–69, ECF No. 253.

10

6.  The Debtor worked as a chemist in the pharmaceutical industry from 1996–2007. Tr. 6, ECF No. 254. From 2004–2007, the Debtor earned as much as $180,000.00 per year, including stock options, 401(k) matches, and bonuses. *Id.* at 6–7. Ms. Chen testified that she believed he earned between $100,000–120,000.00 per year during this same timeframe. Tr. 13, ECF No. 253. According to Ms. Chen, the Debtor made anywhere from $1.589 million in 2010 to $180,000.00 in 2011 to $275.00 in 2012. *Id.* at 58, 106–08.

B.  The Formation and Background of LXEng

7.  On July 19, 2007, the Debtor and Mr. Little formed LXEng under the laws of the State of Nevada to sell engineering services for trichlorosilane ("TCS") production.[15] Tr. 7, 9–10, ECF No. 254. Originally, the Debtor and Mr. Little each held 50% ownership and membership interests in LXEng. J. Stip. 2.

8.  Before working for LXEng, Mr. Little worked for Dow from 1978–2002 on its TCS technology. Tr. 11, ECF No. 248. In that capacity, Mr. Little had access to technical drawings, operating procedures, cost structures, and quality controls for Dow's TCS manufacturing. *Id.* at 18–19. Mr. Little's only experience working with TCS occurred at Dow. Tr. 23, ECF No. 254. The Debtor had never before manufactured TCS. *Id.* at 7.

9.  TCS manufacturing facilities are large and can cover several city blocks, as Dow's does. Tr. 9, ECF No. 248.

10. While working for LXEng, Mr. Little worked with an engineering company called CDI Engineering Services ("CDI") to develop the technology designs to manufacture TCS,

---

[15] TCS is a molecule used to produce solar silicon and polysilicon. Tr. 7, ECF No. 248. Solar silicon and polysilicon are highly refined, high purity silicon materials used to make items like computer chips and solar panel rays. *Id.* at 7–8. TCS is manufactured by taking silicon metal in lump form, grinding it into a fine powder, and then placing it into a fluidized bed reactor at high temperatures with some pressure. *Id.* From there, it is distilled, boiled, and purified further until it becomes a highly purified form of TCS. *Id.* It is reactive when exposed to water and very corrosive to skin and is, therefore, very hazardous. *Id.* at 19.

including the fluid bed reactor design. Tr. 11, ECF No. 254. CDI grew concerned that Mr. Little may have misused Dow's technology. *Id.* at 17. Mr. Little warned the Debtor from the beginning of their venture that Dow reacted aggressively in the past if it suspected an employee misused its technology. *Id.* at 14.

11. Although Dow spent several decades and over $100 million developing its TCS technology, LXEng began selling TCS technology for large amounts of money within weeks of the entity's formation. *See id.* 24–26. Dow protects the confidentiality of its TCS technology with abundant caution and endeavors to keep its proprietary TCS technology safely guarded through, *inter alia*, confidentiality agreements, physical restrictions to its facilities, and restricted access. Tr. 9–10, ECF No. 248.

12. Between August and October 2007 alone, LXEng entered into contracts with two companies worth more than $10 million. Tr. 25–26, ECF No. 254. LXEng never again entered into a contract with a single customer after 2007. *Id.* at 37.

13. On November 3, 2007, Mr. Little unexpectedly passed away. J. Stip. 2. The Debtor told LXEng's customers that Mr. Little "downloaded" his TCS experience into the company and CDI. Tr. 22–23, ECF No. 254.

14. After Mr. Little's death, the Debtor made Ms. Chen a 10% owner and member of LXEng, which she remained until the July 3, 2013 Divorce Judgment. Tr. 29, 31, 50, ECF No. 253. Throughout Ms. Chen's membership, the Debtor retained the other 90% interest in LXEng. *Id.* While serving as a member, Ms. Chen never attended a meeting of LXEng's members. *Id.* at 50.

15. Ms. Chen testified that she assisted the Debtor with LXEng in 2007, after Mr. Little died, while continuing to work full-time for Novartis. *Id.* at 14, 127. Her work included paying

12

bills, filing, reviewing resumes, networking, and providing referrals, and retrieving mail, which was directly delivered to the Marital Home. *Id.* at 14, 127–29. She also claimed that she worked with a headhunter to locate candidates for employment. *Id.* at 14.

16. In 2007, in the face of mounting business and frenzied legal pressures, Ms. Chen introduced her then-husband, the Debtor, to relatives to help him locate clients. *Id.* at 14–15.

17. In December 2007, Mr. Little's widow, Kathy Little, exercised the Termination Put option in LXEng's operating agreement, which required LXEng to purchase Mr. Little's 50% interest in the company at fair market value upon his death. Tr. 28, ECF No. 254.

C. Dow's Investigation of the Debtor and LXEng

18. On March 27, 2008, Dow asked the Debtor to "ensure that its trade secrets or other intellectual property were not used or disclosed by Mr. Little without authorization" while undertaking LXEng's business. Pls.' Ex. 10, at 1. Dow asked for access to review Mr. Little's computer, which the Debtor refused. *Id.*; Tr. 15–16, ECF No. 248.

19. In October 2008, the Debtor and his legal counsel, Hofheimer Gartlir & Gross, LLP ("HGG"), met with Dow's counsel because of Dow's growing concerns regarding LXEng's use of its trade secrets and intellectual property. Tr. 87, ECF No. 254.

20. After the meeting, on the advice of legal counsel, LXEng "loaned" the Debtor $4.8 million on November 10, 2008, which he transferred into his personal account. *Id.* at 88–89. The Debtor claims he panicked, concerned that Dow could freeze LXEng's bank accounts, but he believed that Dow could not reach his personal bank accounts. *Id.*

21. In early 2010, Dow reviewed hard-copy documents mined from Mr. Little's computer at the FBI office in Washington, D.C. Tr. 11, ECF No. 248. During the summer of 2010, Dow viewed an image copy of Mr. Little's computer at an FBI office in Michigan. *Id.* at 15-16.

Mr. Little's computer contained aerial photographs of Dow's TCS facilities with labels describing Dow's manufacturing process. *Id.* at 16. The computer also contained technical drawings of a fluid bed reactor similar to Dow's, as well as documents referring to selling the TCS technology and discussing the breadth of Dow's knowledge on TCS technology. *Id.* at 16–18.

D.  The Debtor Forms Offshore Businesses and Bank Accounts to Protect His Assets

22. The Debtor wanted to form new companies due to LXEng's liabilities, including debts claimed by Mrs. Little and Dow. Pls.' Ex. 3, at 9.

23. In May 2008, the Debtor formed Beijing Hua Xia Xin Jie Science & Technology ("BHX") in the People's Republic of China as its sole owner. Tr. 39–40, ECF No. 254. BHX entered into numerous contracts for the sale of its TCS engineering services and kept its bank accounts in China. *Id.* at 40–43.

24. In July 2008, the Debtor formed LSI in the Federation of St. Kitts and Nevis. Tr. 43, ECF No. 254. Dr. Xiao opened a bank account ("Seychelles Account") for LSI at Barclays Bank (Seychelles), Ltd. *Id.* at 49. Only the Debtor held an interest in LSI. *Id.* at 43.

25. LSI entered into a $10 million contract in August 2008 with Woongjin Polysilicon Co., Ltd. ("Woongjin"). *Id.* at 56. Even though the contract was not in LXEng's name, LXEng's employees performed all of the services for the contract. *Id.* at 38, 62.

26. Woongjin paid between $8.5–8.9 million into LSI's Seychelles Account under the contract. Tr. 68, ECF No. 254; Pls.' Ex. 3, at 2.

27. In October 2008, the Debtor formed LXE Solar, Ltd. ("LXE Ltd.") as a "middle man" company in the British Virgin Islands and acted as sole owner. Tr. 72, 74, ECF No. 254. LXE Ltd. never had employees but held a bank account in Hong Kong. *Id.*

14

28. In December 2008, the Debtor, as sole owner, formed LXE Solar Systems, LLC ("LXE Solar Systems"). *Id.* at 76–77.

29. Sometime between December 5, 2008 and March 2009, the Financial Intelligence Unit, a Seychelles government agency, froze the Seychelles Account because the proceeds were derived from alleged criminal conduct. Tr. 49–50, 67, ECF No. 254; Pls.' Ex. 3, at 3.

30. In 2009, the Debtor continued to form offshore companies in the British Virgin Islands that he fully owned. Pls.' Ex. 4, at 9.

E.  The Dow Action

31. On January 3, 2011, Dow commenced the Dow Action against the Debtor, LXEng, and LSI, amending its complaint ("First Amended Complaint") on June 12, 2013. *See* Pls.' Exs. 23, 25. Dow brought claims relating to misappropriating its technology under Michigan's Uniform Trade Secrets Act and sought an accounting of all profits and compensatory damages related thereto. Pls.' Ex. 25, at 30, 32. The First Amended Complaint also requested injunctions against the Debtor and other named defendants and sought punitive damages. *Id.* at 31–33.

32. Later, Dow added LXE Ltd. and BHX as defendants. *Id.* at 24–25.

33. Although Ms. Chen was not personally named in the Dow Action, she knew about the litigation claims for intellectual property infringement against her husband and LXEng. Tr. 24, ECF No. 253. She also knew that the Debtor spent significant amounts of money in legal fees on LXEng's various lawsuits. *Id.* at 25, 110, 141–42. By 2013, despite her status as LXEng's 10% member, Ms. Chen started dropping LXEng's and the Debtor's unopened mail into a box for her husband to handle when he came home, consciously taking on a more passive role with LXEng. *Id.* at 43–49.

15

34. In April 2012, Dow deposed the Debtor in the Dow Action. Tr. 13, ECF No. 254.

35. On March 13, 2013, the District Court rendered a decision and *Daubert* order partially granting Dow's motion to exclude evidence offered by the Debtor's expert on Dow's claimed trade secrets because the evidence lacked reliability and did not meet the standards for admission under the Federal Rules of Evidence, thus dealing a striking blow to the Debtor's prospects for success in the litigation.[16] Pls.' Ex. 27. In the *Daubert* order, Dr. Hugo S. Caram ("Dr. Caram"), who was appointed by the District Court to serve as a neutral, independent expert under Fed. R. Evid. 706, confirmed that four of Dow's trade secrets were "not in the public domain, not ascertainable by proper means, and derive value from not being publicly known" and concluded that the defendants "used some of the identified trade secrets in their fluid bed reactor technology sold to third parties." *Id.* at 20–21. Dr. Caram further concluded that Mr. Little provided the information to the Debtor and LXEng for their own benefit. *Id.* at 22.

36. Shortly thereafter, on April 12, 2013, HGG and Brooks Kushman P.C. ("Brooks Kushman") moved to withdraw as Debtor's counsel for non-payment of legal fees and sent the motion to withdraw to Ms. Chen's Marital Home. Pls.' Ex. 28. The $2.3 million remaining in legal reserves after the $600,000.00 Little Action settlement payment had been exhausted, and the Debtor owed HGG over $600,000.00. Pls.' Ex. 28, at 2; Tr. 24–25, ECF No. 255. On April 25, 2013, the District Court conditionally granted the motion to withdraw, and on May 3, 2013, the District Court allowed HGG and Brooks Kushman

---

[16] In deciding a *Daubert* motion, a federal judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid[.]" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). In the Dow Action, the District Court found otherwise regarding the evidence provided by the Debtor's expert on three of Dow's claimed trade secrets and on the expert's legal conclusions on all 17 of Dow's claimed trade secrets.

to withdraw their appearances. Pls.' Exs. 29–30. The District Court ordered the Debtor to file a notice on the docket by May 9, 2013, stating whether he would retain counsel or intended to proceed pro se. Pls.' Ex. 29, at 1. He did no such thing. Tr. 35, ECF No. 255.

37. On May 8, 2013, Attorney Luis Medina sent Judge Thomas L. Ludington, the U.S. District Judge presiding over the Dow Action, a letter ("Medina Letter") on behalf of the Debtor, LXEng, and LSI, stating that the Debtor, LXEng, and LSI were retaining his firm "to prepare and file bankruptcy petitions for each." Pls.' Ex. 31, at 1. The Medina Letter detailed that none of the defendants could afford to retain counsel. *Id.*

38. On June 5, 2013, Dow filed a Motion for Default Judgment against all of the defendants seeking an award of $15.7 million in monetary damages based on the disgorgement of profits earned by the defendants in selling Dow's technology, plus prejudgment interest and reasonable attorneys' fees, and a permanent injunction. Pls.' Ex. 32. The Debtor did not file any objection to the Motion for Default Judgment. Tr. 40, ECF No. 255; *see* Pls.' Ex. 33, at 1.

39. On June 11, 2013, the District Court ordered a hearing to take place on Dow's Motion for Default Judgment on July 30, 2013 at 4:00pm. Pls.' Ex. 33, at 1. On June 12, 2013, Dow sent five copies of the Order Setting Hearing on Dow's Motion for Default Judgment by certified mail with return receipt to the Marital Home. Pls.' Ex. 34, at 1–2.

40. On June 24, 2013, the Debtor filed an appearance in the Dow Action. Pls.' Ex. 35.

41. Up to and throughout 2013, Ms. Chen received numerous court filings related to the Dow Action at the Marital Home, which, in conscious disregard, willful blindness, or indifference, she threw, unopened, into a box for the Debtor to handle when he came home. Tr. 42–49, ECF No. 253.

42. At the time of the Divorce Action, Ms. Chen knew that if Dow secured a judgment lien against the Debtor, it could seize all of the Debtor's interest in their jointly held TD Ameritrade Account ("TD Account"), their Novartis Federal Credit Union ("NFCU") Account, or the Debtor's retirement accounts. *Id.* at 28; Pls.' Ex. 81, at 111–12.

43. On April 8, 2014, Dow filed a proof of claim against the Debtor's bankruptcy estate that asserted $15.7 million in damages. Pls.' Ex. 89. The Dow claim is deemed admitted as the Debtor has not interposed an objection to it. ECF No. 258, Case No. 13-51186.

F.   The Little Action and The Seychelles Action

44. On January 16, 2009, Mrs. Little sued the Debtor and LXEng in the Little Action for compensatory damages to recover the value of Mr. Little's membership interest, which she valued at $6,725,000.00, though the Debtor disputed it. *See generally* Pls.' Ex. 12; Tr. 29, 31, ECF No. 254. In doing so, she sought to enforce the Termination Put contained within LXEng's operating agreement. Pls.' Ex 12 at 4–5. That provision required LXEng to purchase Mr. Little's 50% interest in LXEng upon his death. *Id.*

45. In the complaint filed in the  December 2009 Seychelles Action, the Debtor stated that he formed LSI to enter into the Woongjin contract because LXEng faced potential liabilities due to, *inter alia*, (1) "claims by third parties that Michael Little ("Mr. Little") had possibly infringed their intellectual property rights," and (2) Mrs. Little's claims related to Mr. Little's interests in LXEng. Pls.' Ex. 3, at 9. In his mind, *and in his own words*, "the formation of [LSI] was a routine transaction of asset protection," meant to keep money offshore. *Id.* at 2; Tr. 59–61, ECF No. 254. Ms. Chen was fully aware of the reasoning behind LSI's formation. Tr. 26–27, ECF No. 253.

46. Seychelles unfroze the Seychelles Account at the end of 2009, and the Debtor transferred $2.9 million to HGG as legal reserves and as settlement negotiation funds for the Little Action and wired $6 million in early 2010 to a newly formed solely-owned, domestic company, LXE Solar, LLC ("LXE LLC"). Tr. 61, 65–71, ECF No. 254. The Debtor formed LXE LLC to bring LSI's money into the United States. *Id.* at 70.

47. In 2011, Ms. Chen was deposed in the Little Action. Tr. 23, 108, ECF No. 253; Tr. 32, ECF No. 254. She was acutely aware at that time that Mrs. Little sought between $1–2 million from her then-husband and LXEng and that they still owed Mrs. Little around $300,000.00. Tr. 24, 39, 61, 108–09, ECF No. 253.

48. In April 2012, the Debtor settled the Little Action for $1.5 million. Tr. 36, 72, ECF No. 254. Shortly thereafter, in late April or May 2012, the Debtor paid Mrs. Little $1.1 million. *Id.* at 37. In early 2013, the Debtor made an additional $100,000.00 payment to Mrs. Little, pursuant to the settlement agreement terms. *Id.* As of the Petition Date, the Debtor and LXEng still jointly owed Mrs. Little $300,000.00. *Id.*

G. The Debtor Forms an Entity in Ms. Chen's Name

49. On January 5, 2011, the Debtor created yet another company called Intelligent Solar Partners, LLC ("Intelligent Solar") and made Ms. Chen its sole owner. Tr. 15–16, ECF No. 253; Tr. 78–79, ECF No. 254; Pls.' Ex. 16 at 1. At the time of trial, Ms. Chen still owned Intelligent Solar, even four years after the Divorce Judgment entered. Tr. 20, ECF No. 253.

50. Intelligent Solar performed the same solar power business as LXE Solar Systems, which the Debtor wholly owned. Tr. 78–79, ECF No. 254. Neither Ms. Chen nor the Debtor had any background or experience in solar power installation before forming Intelligent Solar.

19

Tr. 16–17, ECF No. 253. When forming contracts, the Debtor acted as the president of Intelligent Solar. Tr. 84, ECF No. 254.

51. Between January 18 and December 5, 2011, the Debtor and Ms. Chen invested $706,500.00 into Intelligent Solar from their jointly owned NFCU Account. *Id.* at 83–84; Pls.' Exs. 17–19.

H.  The Suspicious Asset Transfers Before the Divorce

52. Between December 21, 2007 (which was the month that Mrs. Little exercised her Termination Put option) and October 15, 2010, Ms. Chen made 12 transfers worth approximately $600,000.00 to her relatives, including to her mother, father, sister, niece, and brother-in-law in China, from the NFCU Account held jointly between the Debtor and Ms. Chen. Tr. 100–09, ECF No. 254; Pls.' Exs. 53–64. These transfers included:

(1) a $48,000.00 wire on December 21, 2007;

(2) a $50,000.00 wire on December 26, 2008;

(3) a $49,998.00 wire on July 8, 2009;

(4) a $49,999.00 wire on July 8, 2009;

(5) a $49,998.00 wire on July 17, 2009;

(6) a $49,999.00 wire on July 17, 2009;

(7) a $50,000.00 wire on July 17, 2009;

(8) a $50,000.00 wire on September 8, 2009;

(9) a $49,998.00 wire on September 8, 2009;

(10) a $49,999.00 wire on September 8, 2009;

(11) a $49,998.00 wire on October 15, 2010; and

(12) a $49,999.00 wire on October 15, 2010. *Id.*

53. The Debtor knew of these transfers but never told his divorce counsel, Elizabeth Vengen ("Attorney Vengen"). Tr. 100, ECF No. 254; Pls.' Ex. 82, at 88.

I.    The Expedited Divorce Action and Asset Division Between Spouses

54. As early as 2010, the Debtor and Ms. Chen discussed how to divide their marital assets if they later decided to divorce. Tr. 20–21, ECF No. 253. The Debtor claimed, however, that he never wanted to get divorced because of the cultural shame in doing so. Tr. 42–43, 47, 97–98, ECF No. 255.

55. The Debtor frequently traveled abroad, and during such time, Ms. Chen generally had no knowledge of his whereabouts. Tr. 40–41, 131–33, ECF No. 253.

56. By April 2012, LXEng no longer marketed any products or services to the public. Tr. 62–65, ECF No. 254. LXEng was insolvent by May 2013. Pls.' Ex. 31, at 1.

57. Typically, in a divorce case, the spouses exchange financial information during discovery, and the attorneys identify and value assets to negotiate a fair and voluntary arm's length settlement agreement. Tr. 88–93, ECF No. 248. The Debtor's attorney, Attorney Vengen, did no such thing in this divorce case. Pls.' Ex. 82, at 61–66.

58. A lightning fast divorce can occur in New Jersey within 30–60 days. Tr. 90, ECF No. 248. In more complex cases, like here, where a spouse has closely held corporations, divorces typically take anywhere from six months to a year. *Id.* The Debtor's and Ms. Chen's divorce was completed in 21 days from start to finish. *See* J. Stip. 2–3. Attorney Vengen's involvement in the case lasted for a mere seven days. *See* Pls.' Ex. 82, at 22.

59. Robert Siegel ("Attorney Siegel") of Townsend, Tomaio & Newmark, LLC represented Ms. Chen in the Divorce Action. *Id.* at 21–22, 53–54, 151; J. Stip. 2. She first met with representatives from the law firm in May 2013, after she and the Debtor had already

decided how to divide their assets. *See* J. Stip. 2; Tr. 22, ECF No. 253. Ms. Chen directed

Attorney Siegel to formally draft the PSA consistent with her and the Debtor's previous

accord. J. Stip. 2.

60. Ms. Chen believed that she was entitled to $6 million in alimony based largely on internet

research and discussions with friends. Tr. 89–90, ECF No. 253. The Debtor agreed that

based on his own internet research, he owed her millions of dollars in alimony, even though

he was essentially unemployed at the time. Tr. 47, 70–71, ECF No. 255. Neither party

received advice from counsel before coming to their shared conclusion. *Id.* at 72.

61. Ms. Chen filed the Divorce Action in New Jersey against Dr. Xiao on June 12, 2013—one

day after the District Court in the Dow Action scheduled a hearing on the $15.7 million

motion for default judgment against the Debtor. J. Stip. 2; Pls.' Ex. 1.

62. On June 25, 2013, Ms. Chen gave the Debtor a first draft of the PSA. Tr. 55, ECF No. 253.

63. That same day, the Debtor deposited a $120,000.00 check ("$120,000.00 Check") dated

December 31, 2012 from LXE LLC for his compensation from 2009–2012 into the NFCU

shared draft personal checking account. J. Stip. 4; Pls.' Ex. 51; Tr, 50–52, ECF No. 255.

At that point in time, both spouses had already planned for Ms. Chen to receive the money

from the NFCU shared draft personal checking account. Pls.' Ex. 2, at 18; Tr. 69–70, ECF

No. 255. According to the Plaintiffs' expert, Mr. Cheifetz, deposits such as these are

generally unheard of on the eve of a divorce, and if done, divorce counsel would seek to

recapture the money for an equitable distribution. Tr, 127–28, ECF No. 248.

64. The following day, the Debtor first met with Attorney Vengen to discuss the divorce and

PSA. Pls.' Ex. 82, at 22.

65. The Debtor never signed an engagement agreement with Attorney Vengen or paid a retainer because the Debtor was "moving faster than the speed of light." Pls.' Exs. 42, at 4; 43–44; 82, at 17, 32–33.

66. Neither the Debtor nor Attorney Vengen made any substantial edits to the PSA. Tr. 55–56, ECF No. 253. Ms. Chen did not make any substantive changes to the final PSA either. *Id.*

67. On the very next day, Ms. Chen filed an Answer on the Debtor's behalf in the Divorce Action and represented to the Superior Court that the parties had reached a settlement agreement and would execute the PSA shortly. Pls.' Ex. 40.

68. According to Attorney Vengen, the case moved "pretty quick" because the Debtor understood the system and wanted to finalize the divorce quickly. Pls.' Ex. 82, at 48, 57–60. By the time she became involved with the case, she claimed that the case was essentially over. *Id.* at 20, 48. Since it was an uncontested divorce, Attorney Vengen believed she was hired to simply review the PSA and ensure that the Debtor knew of the PSA's ramifications. *Id.* at 20, 64–65. Attorney Vengen did not recall investigating Ms. Chen's work history, income, or the value of the couple's marital or business assets. *Id.* at 61–62, 81, 96–97.

69. According to Mr. Cheifetz, attorneys in divorce actions typically engage in basic discovery to identify and value marital assets. Tr. 88–89, 93, ECF No. 248. This would have been especially true here given that the Debtor frequently traveled abroad, raising a concern that he holds offshore accounts where he was secreting money. *Id.* at 132; Tr. 40–41, ECF No. 253. Their respective legal counsel advised the parties of their right to engage in discovery regarding their respective assets, but both waived that right. Pls.' Ex. 2, at 24.

70. Their respective legal counsel also advised the parties to exchange financial statements, which they likewise waived. *Id.* In New Jersey, case information statements are typically

drafted early in the case to give both the parties and the court a financial "lay of the land," to exchange disclosures of their marital assets, and to protect the parties in the future should fraud accusations over a material non-disclosure arise. Tr. 82–83, 95, 132, ECF No. 248. Neither party submitted case information statements to the Superior Court. *Id.* at 82–83, 94–95; Pls.' Ex. 76, at 5. The Plaintiffs' financial expert witnesses assessed that the Debtor's insolvency, before the PSA asset transfers, landed in the range of $15.2–15.4 million and insolvency after the asset transfers between $16.2–16.6 million. Tr. 10, ECF No. 250.

71. At the time of the Divorce Action, Ms. Chen steadily earned approximately $100,000.00 in income at Novartis and had consistently earned such since 2007. J. Stip. 3.

72. The PSA grossly overestimated the Debtor's salary, which it valued at $180,000.00 per year from his businesses. Pls.' Ex. 2, at 6.

73. In actuality, the Debtor earned $162,147.00 in 2011. Pls.' Ex. 73, at 4; Tr. 49, ECF No. 255. In 2012, he earned only $120,000.00. Pls.' Ex. 4, at 1; Tr. 50, ECF No. 255. That single $120,000.00 Check constituted pay owed to him from 2009–2012. Pls.' Ex. 51; Tr. 51, ECF No. 255. From January 1, 2013 to the time of the Debtor's bankruptcy filing on July 30, 2013, his income was, in fact, only $25,500.00. Pls.' Ex. 4, at 1; Tr. 53, ECF No. 255.

74. The PSA stated that LXEng was the Debtor's largest business. Pls.' Ex. 2, at 6. In reality, both the Debtor and LXEng were insolvent as of May 8, 2013, as the Medina Letter acknowledged. Pls.' Ex. 31, at 1. By 2011, LXEng completed all of its contracts and had not entered into any new contracts, closed its offices and labs, and by 2012, it had no material assets and was winding down. Tr. 39, ECF No. 254; Tr. 57–61, ECF No. 255. A

mere 27 days after the Divorce Judgment entered, the Debtor valued his 100% interest in his largest business, LXEng, at $0.00. Tr. 77–78, ECF No. 255; Pls.' Ex. 15, at 5.

75. Ms. Chen knew that LXEng had not entered into a new contract in five years and that the Debtor's income and distribution from LXEng had dropped exponentially since their peak in 2010. Tr. 30–31, 107–08, 110, ECF No. 253. She recognized that LXEng was simply "running out" of money. *Id.* at 137.

76. At trial, Ms. Chen conceded that she knew it would be difficult to collect alimony from the Debtor because of his various businesses, lawsuits, and extensive travels overseas.

77. The Debtor admitted that he used the PSA to place his children in a solid financial position. Tr. 106–07, ECF No. 255. By putting the assets in Ms. Chen's hands, he believed that these monies would not be subject to his creditors' claims. Tr. 85–86, ECF No. 253.

78. Attorney Vengen noticed that the Debtor was very "intense" the week before the Divorce Judgment entered and that he spoke with her "*constantly.*" Pls.' Ex. 41, at 2. A week after the Divorce Judgment entered, she emailed Attorney Siegel to say that "we could have made some serious dough if they weren't in such a hurry!" Pls.' Ex. 42, at 3.

79. Neither Ms. Chen nor the Debtor, nor their respective counsel, disclosed the pending Dow Action or Little Action to the presiding judge in the Divorce Action. Tr. 38–40, ECF No. 253.

80. The Divorce Judgment and PSA accordingly entered on July 3, 2013, without the benefit of any formal discovery. J. Stip. 3; Pls.' Ex. 2, at 1, 5. The Superior Court intentionally did not pass on the PSA's merits. Pls.' Ex. 2, at 2–3.

81. Both divorce attorneys oddly requested that the Divorce Judgment not include the PSA because the parties did not want it to become a part of the public record. Pls.' Ex. 76, at 4–

10. Both parties' experts agreed that it is uncommon for parties in a divorce to deliberately exclude a property settlement agreement from a divorce judgment. Tr. 132–134, ECF No. 248; Tr. 31–32, ECF No. 249; Tr. 23, ECF No. 251. The Superior Court rejected the parties' request and instead attached the PSA to the Divorce Judgment. Pls.' Ex. 76 at 6, 8.

### i. The Disproportionate Division of Assets

82. As of July 2, 2013, the value of the Debtor and Ms. Chen's jointly-owned assets, excluding retirement accounts and the cars in the Debtor's name, but including the Debtor's Pension Plan, totaled $2,833,995.36.[17] Tr. 13, ECF No. 250; Pls.' Ex. 84, at 9. The joint assets and their value are broken down below:

| Joint Assets | Value of Assets Prior to PSA | Value of Debtor's Share of Assets Prior to PSA | Value of Debtor's Retained Assets Post PSA |
|---|---|---|---|
| TD Ameritrade Brokerage | $1,654,234.38 | $827,117.19 | $0.00 |
| Marital Home | $500,000.00 | $250,000.00 | $0.00 |
| Debtor's LXEng Pension | $410,472.00 | $205,236.00 | $410,472.00 |
| NFCU Shared Draft Checking | $120,977.19 | $60,488.60 | $0.00 |
| NFCU Money Market | $63,690.97 | $31,845.49 | $0.00 |
| NFCU Savings | $40,495.86 | $20,247.93 | $25,000.00 |
| 12-Month Shared CD | $18,767.59 | $9,383.80 | $0.00 |
| Marital Home Furnishings | $10,000.00 | $5,000.00 | $0.00 |
| 6-Month Shared CD | $8,192.46 | $4,096.23 | $0.00 |
| LXE LLC Interest | $3,203.35 | $1,601.68 | $3,203.35 |
| PNC Bank Checking- Intelligent Solar | $2,561.56 | $1,280.78 | $0.00 |
| Keystone Healthcare, LLC Interest | $1,400.00 | $700.00 | $1,400.00 |
| **Total Assets** | **$2,833,995.36** | **$1,416,997.70** | **$440,075.35** |

---

[17] Mr. Finkel intentionally omitted the retirement plans held in each individual spouse's name because they could be claimed as exempt from the reach of creditors under state and federal law. Pls.' Ex. 84, at 4. He did include the Pension Plan in his calculations because the Chapter 7 Trustee filed an objection to the claimed exemption in the Pension Plan, which was sustained by this Court in the Pension Plan Ruling. *Id.* The cars are omitted from his calculations because they are held in the Debtor's name alone.

83. Based on Mr. Finkel's calculations, when adding the Debtor's 50% interest in the joint assets to his 100% ownership interest in his two cars, the Debtor's assets totaled $1,430,126.68, as of July 2, 2013. Tr. 13–14, ECF No. 250; Pls.' Ex. 84, at 9.

84. On that same date, the Debtor's claims against him totaled approximately $16,673,825.49 and consisted of: (1) a $300,000.00 claim by Mrs. Little; (2) a $11,917.47 claim by the American Arbitration Association; (3) a $661,908.02 claim by HGG; and (4) a $15.7 million claim by Dow. Pls.' Ex. 84, at 9. When subtracting the $16,673,825.49 in liabilities from the value of the Debtor's assets ($1,430,126.68), it left a potential $15,243,698.81 deficiency the day before the Debtor entered into the PSA. Tr. 14, ECF No. 250. Neither the Debtor nor Ms. Chen, nor their respective counsel, disclosed the Debtor's liabilities to the presiding judge in the Divorce Action. Tr. 38–40, ECF No. 253.

85. On July 3, 2013, however, he only retained $440,075.35 in joint assets plus his car worth $3,470.00, bringing his total assets to $443,545.35 the day the PSA effectuated. In one day, he increased his insolvency and decreased the assets available for creditor recovery by making the Transfers in the amount of $986,581.33, leaving the Debtor insolvent by $16,230,280.14 once the Divorce Judgment and PSA entered.[18] Tr. 14, 20–21, ECF No. 250; Pls.' Ex. 84, at 5, 9. Even assuming, *arguendo*, that the liability owed to Dow might be $0.00, the Debtor would still be insolvent by $530,000.00. *Id.* at 22, ECF No. 250; Pls.' Ex. 84, at 9.

---

[18] The Transfers are calculated by taking the $443,545.35 value of the Debtor's assets on July 3, 2013, after the PSA and Divorce Judgment entered, and subtracting it from the value of the Debtor's assets on July 2, 2013, worth $1,430,126.68. The Transfers total $986,581.33.

86. After the Superior Court approved the PSA, the Debtor's assets totaled only $443,545.35, plus his other pensions.[19] Tr. 14, ECF No. 250. The vast majority of the joint marital assets that he received were illiquid, since the Debtor received only $25,000.00 in cash and $410,472.00 from the Pension Plan, which he later attempted to exempt in this underlying Chapter 7 bankruptcy case. Pls.' Ex. 84, at 4. Through the PSA transfers, the Debtor markedly increased his insolvency and decreased the assets available for his creditor recovery.

87. Prior to the Divorce Action, the Debtor and Ms. Chen owned the unencumbered Marital Home as tenants by the entirety. J. Stip. 4. Without an appraisal, the couple valued the home at $500,000.00. *Id.*; Pls.' Ex. 2, at 5, 17; Tr. 63, ECF No. 253. Pursuant to PSA § 26, the Debtor transferred his one-half interest in the Marital Home to Ms. Chen. J. Stip. 4. Had Ms. Chen decided to sell the Marital Home after the Divorce Judgment entered, she was entitled to 100% of the sale proceeds. Pls.' Ex. 2, at 18.

88. The Debtor also relinquished his interest in the jointly owned bank accounts at NFCU, which had the following balances as of June 30, 2013: $63,690.97 in the money market account, $120,977.19 in the shared draft personal checking account, $18,767.59 in the 12-month shared certificate of deposit, and $8,192.46 in the 6-month shared certificate of deposit. *Id.*; J. Stip. 4; Tr. 71–72, 120, ECF No. 253; Pls.' Ex. 45.

89. PSA § 27 provided that Ms. Chen would transfer the NFCU jointly owned savings account with approximately $25,000.00 to the Debtor. Pls.' Ex. 2, at 18. Even though the jointly owned savings account had a balance of $40,495.86, Ms. Chen wrote a check to the Debtor

---

[19] This Court ruled that the Pension Plan was non-exempt in the Debtor's Chapter 7 bankruptcy estate in its Pension Plan Ruling issued on August 22, 2018.

for $25,000.00 and retained the remaining $15,495.86. Tr. 74–75, ECF No. 253; Pls.' Ex. 45, at 1.

90. The Debtor and Ms. Chen held a personal investment account as joint tenants—the TD Account, which held $1,654,234.38 as of June 19, 2013. J. Stip. 3; Tr. 28, 79–81, ECF No. 253; Pls.' Ex. 2, at 18. Pursuant to PSA § 28, the Debtor transferred his one-half interest, worth approximately $827,295.00, in the TD Account to Ms. Chen "in lieu of alimony." Pls.' Ex. 2, at 18. The TD Account funds were derived from LXEng distributions. Tr. 83, ECF No. 253.

91. Under New Jersey law, a judge does not possess the authority to award lump sum alimony payments; they can only be done by party agreement. Tr. 99, ECF No. 248; Tr. 32–33, ECF No. 251. Normally, alimony is taxable to the recipient spouse and tax deductible to the payor spouse, but lump sum payments suffer no tax consequences. Tr. 99–100, ECF No. 248.

92. Courts always weigh alimony against the risk that it may terminate upon remarriage, death of either party, cohabitation, or change of circumstances in either party's income. *Id.* at 101–02. The expert testimony of Mr. Cheifetz indicated that it is likely that if the PSA had been negotiated at arm's length, the lump sum payment would have been closer to $150,000.00, instead of the $827,295.00 that Ms. Chen received. *Id.* at 109–10. He further opined that it was unusual for the Debtor's counsel not to advise the Debtor about how grossly inequitable the PSA was, as drafted. *Id.* at 110–11. This is especially true given the fact that alimony may have actually been owed to the Debtor based on his actual income at the time of the Divorce Action. *See id.* at 111–12, 137–38.

93. Pursuant to PSA § 11, the Debtor was obligated to pay $475.00 per week or $2,056.00 per month to Ms. Chen for child support. *Id.* at 3. The PSA overstated the Debtor's child support obligation because the parties failed to consider the lump sum that the Debtor paid Ms. Chen. *Id.* at 3–4.

94. PSA § 29 provided that Ms. Chen would retain her interest in a Novartis 401(k) account with a balance on June 19, 2013 of $431,878.00 and a Merck 401(k) account with a balance of $36,289.00 as of June 19, 2013. Pls.' Ex. 2, at 18.

95. Pursuant to PSA § 29, Ms. Chen transferred her interest in the Pension Plan, valued at $410,472.00, to the Debtor. *Id.* at 19. The Debtor retained his interest in a Merck 401(k) with a balance of $109,901.00 as of June 19, 2013, a Vanguard IRA (Schering-Plough) with a balance of $87,296.00 as of June 19, 2013, and a Great West Financial IRA with a balance of $69,000.00 as of June 19, 2013. *Id.*

96. Pursuant to PSA § 30, the Debtor retained his interests in LXEng; LXE Solar Systems, LLC; Ferrara PV, LLC; GTS PV, LLC; and Keystone Healthcare, LLC. *Id.* Ms. Chen retained her interest in Intelligent Solar, which had a value of $2,561.56 at the time of the Divorce Action. *Id.* at 19–20; Pls.' Ex. 50; Tr. 102–03, ECF No. 253. The PSA did not mention the fate of LSI or LXE LLC. Pls.' Ex. 2, at 19–20. In preparing the PSA, neither party conducted any formal valuation of any of the businesses. *Id.* at 5; Tr. 99, ECF No. 253. In his individual bankruptcy schedules filed on September 10, 2013, two months after the Divorce Judgment entered, the Debtor valued his 100% ownership interests in LXEng, LSI, LXE Solar Systems, LLC, Ferrara PV, LLC, and GTS PV LLC at $0.00, his 100% ownership interest in LXE LLC at $3,203.35, and his 100% ownership interest in Keystone Healthcare, LLC at $1,400.00. Pls.' Ex. 15, at 5.

97. Through PSA § 31, the Debtor retained a 2004 Honda Pilot, which he valued at $3,470.00 in his bankruptcy schedules. J. Stip. 5; Pls.' Ex. 15, at 7. The Debtor gave the 2008 Lexus ES300, which he held in title, to Ms. Chen. J. Stip. 5.

98. Under PSA § 32, Ms. Chen retained all of the Marital Home's personal property, including its furniture, appliances, and artwork. Pls.' Ex. 2, at 20.

99. Under New Jersey law, in a contested divorce, the court would have considered a number of factors in its review and approval of a property settlement agreement to ensure equitable distribution. *See* N.J.S.A. 2A: 34-23.1. The Debtors and Ms. Chen completely ignored those statutory factors.

100.    The parties' PSA did not consider either party's economic circumstances at the time of the Divorce Action or the Debtor's need for housing. Tr. 120, ECF No. 248. Ms. Chen had been steadily employed making more than $100,000.00 per year, while the Debtor was unemployed, insolvent, and preparing to file for Chapter 7 bankruptcy. *Compare* J. Stip. 2 (attesting to Ms. Chen's years of Novartis income), *and* Tr. 68–69, ECF No. 253 (discussing Ms. Chen's steady income with few breaks in work between 1996–2015), *with* Pls.' Ex. 31, at 1 (explaining in May 2013, one month before the Divorce Action, that the Debtor was insolvent and imminently filing for bankruptcy), *and* Tr. 65–66, ECF No. 255 (explaining the Debtor's work history and inability to find even a much lower-paying job until late 2013). Notwithstanding these facts, the parties left the Debtor with a measly $25,000.00 in cash to pay his expenses—a vast majority of which was spent in the four weeks between the Divorce Judgment and the Petition Date. *See* Tr. 115–16, ECF No. 248; Pls.' Ex. 15, at 3 (Debtor's bankruptcy schedule showing $2,932.00 in cash on hand and $5,948.00 in a checking account).

31

101.     The Marital Home was not appraised, and the couple did not even attempt to get a competitive market analysis, which can be obtained for free from a realtor. Tr. 115, ECF No. 248; Tr. 63, ECF No. 253. The Marital Home division was highly unusual because, typically, property held by tenants by the entirety is divided equally. Tr. 114–15, ECF No. 248. In an arm's length settlement agreement, Ms. Chen would have been awarded the Marital Home because she was the custodial parent, but the Debtor would have either: (1) received an offsetting or equalizing credit off the top of the division of the remaining cash assets, equivalent to 50% of the Marital Home, which, in this instance, would have been $250,000.00, or (2) Ms. Chen would have encumbered the Marital Home with a $250,000.00 mortgage to the Debtor. *Id.* at 114–15, 118. Neither party or their attorneys considered or negotiated such an adjustment.

102.     College expenses are not typically prepaid because future college costs are unknown due to numerous indefinite variables, such as whether the child will actually attend college, whether he or she will attend a community college, private school, or public institution, tuition cost and living expenses, and whether the child will receive any scholarships or grants. *Id.* at 123–24. While the couple's son was 17 years old and closer to college age at the time of the Divorce Action, the couple's daughter was only 14. Tr. 121, ECF No. 253.

103.     The retirement assets would have been equalized in an arm's length transaction and treated according to their tax consequences. Tr. 115, 117, ECF No. 248. Even though Ms. Chen relinquished her right to the Pension Plan, and the Debtor tried claiming the Pension Plan as exempt from the Chapter 7 bankruptcy estate to the detriment of his creditors, the tax consequences of this allocation were significant. *Id.* 116–17; Pls.' Ex. 15, at 10. When

32

partners divide assets so that one spouse retains retirement assets and the other retains the cash assets, it indicates intent to make one spouse judgment-proof since creditors cannot attach to retirement assets. Tr. 96, ECF No. 248.

104.    The non-retirement cash assets, non-retirement bank accounts, and brokerage accounts would have been divided equally in an arm's length settlement agreement, with the Debtor receiving the first $250,000.00 as an offsetting or equalizing credit for his interest in the Marital Home. Tr. 117, ECF No. 248.

105.    The PSA patently ignored the Debtor's and Ms. Chen's significant debts and liabilities, including the $300,000.00 debt owed to Mrs. Little and the potential multi-million dollar liability owed to Dow. *Id.* at 108–09, 119, 136–37.

106.    The PSA failed to consider the tax treatment of the marital assets and the way each was transferred, divided, or retained. Tr. 87–88, 119–20, ECF No. 248. The PSA gave the Debtor heavily taxable assets upon liquidation, while Ms. Chen received assets not as harshly taxed.[20] *Id.* at 87.

107.    Neither party or their attorneys accounted for the Debtor's contributions toward acquiring the marital assets and the value of those assets. *Id.* at 119.

*ii.    The Intentional Duping of Attorney Vengen and the Superior Court*

108.    Attorney Vengen was unaware that the Debtor earned substantially less than $180,000.00 in 2012 and 2013. Pls.' Ex. 82, at 68–69. She also did not know that the Debtor's businesses were collectively worth $4,603.00 or less at the time of the Divorce

---

[20] For instance, the Debtor received $706,000.00 in assets under the PSA, but only $29,600.00 of that was not heavily taxed because the vast majority of the assets were in retirement or pension accounts that required a 10% penalty payment for early withdrawals based on his age and ordinary income tax payments. *Id.* at 87–88, 120. Meanwhile, Ms. Chen received $2,852,000.00 in assets under the PSA, much of which were treated more favorably under the Internal Revenue Code. *Id.*

Action, but she knew the Debtor's businesses were his only source of income. *Id.* at 97–98.

109.    Attorney Vengen never saw the Medina Letter and was oblivious to the Debtor's and LXEng's insolvency and their pending bankruptcy filings. *Id.* at 68, 70–72, 76.

110.    Even though the Debtor knew that Ms. Chen had transferred approximately $600,000.00 to China between December 2007 and October 2010, he did not tell Attorney Vengen. *Id.* at 88; Tr. 100, ECF No. 254. Typically, in divorce actions, partners would request a claw back of half of the money provided to third parties to mitigate their potential liability on financial responsibilities. Tr. 129, ECF No. 248; Tr. 63–64, ECF No. 249. Attorney Vengen admitted that had she known about Ms. Chen's transfers and distributions, she may have counseled the Debtor differently on receiving credit for them. Pls.' Ex. 82, at 89.

111.    The Debtor never informed Attorney Vengen about the Dow Action or that Dow was seeking $15.7 million against him, and she was unaware of the default judgment motion hearing on July 30, 2013. *Id.* at 98–99. Had she known, she admitted that she would have wanted to consult with bankruptcy counsel. *Id.* at 99–100.

112.    The Debtor did not apprise Attorney Vengen with the information that he owed Mrs. Little $300,000.00 from the Little Action. *Id.* at 100.

113.    The Debtor did not tell Attorney Vengen that on the day before he met with her, he deposited the $120,000.00 Check into the NFCU shared draft personal checking account that he had already planned to give to Ms. Chen under the PSA. *Id.* at 90.

114.    Attorney Vengen conceded that had she known about the Debtor's dire financial straits and legal woes, she would have counseled the Debtor to seek alimony. *Id.* at 112.

115.     It is unusual for clients not to share the economic information that negatively affects them in a divorce action with their attorneys. Tr. 130, ECF No. 248.

116.     The parties did not disclose the Debtor's insolvency, the Dow Action, or the $300,000.00 debt owed to Mrs. Little to the Superior Court. Tr. 38–39, ECF No. 253.

117.     The PSA disproportionately divided the marital assets. *See generally* PSA. The parties' cherry-picking of assets clearly intended to make the Debtor judgment-proof. Ms. Chen claimed that the PSA was fair based on a claimed need to provide for the care and education of her children, including a special needs child. Based on the trial record that revealed where the monies went, this was far from the truth.

J.   The Bankruptcy Filings and Exemption Claim

118.     On July 23, 2013, LXEng filed for Chapter 7 bankruptcy protection in this Court. J. Stip. 5; Pls.' Ex. 36. At that time, LXEng had $993.66 in its Wells Fargo Commercial Checking Account, no cash, no accounts receivable, and $978,000.00 in liabilities, exclusive of any liability owed to Dow. Pls.' Exs. 36, at 4, 12–13; 37, at 1. LXEng listed HGG as an unsecured creditor with a claim worth $666,000.00. Pls.' Ex. 36, at 12. LXEng listed no real property in its schedules. *Id.* at 4.

119.     However, LXEng paid Mrs. Little $1.1 million within the two-year period before the Petition Date. *Supra*, ¶ 48.

120.     On July 30, 2013, an hour and a half before the scheduled hearing on Dow's Motion for Default Judgment in the Dow Action, the Debtor filed a voluntary Chapter 7 bankruptcy petition in this Court. J. Stip. 3; Pls.' Ex. 38.

121.     The Debtor identified assets worth $1,364,991.58 as of the Petition Date and claimed exemptions in his assets worth $790,149.14. Pls.' Ex. 15, at 1, 9–11.

122.      The Debtor listed debts of $300,000.00 as owed to Mrs. Little, $11,917.47 as owed

to the American Arbitration Association, and $678,000.00 as owed to HGG and Brooks

Kushman. Pls.' Ex. 39, at 15. In his Schedule F, the Debtor listed Dow as a creditor but did

not list the amount of Dow's claim. *Id.*

123.      On the Petition Date, the Debtor was unemployed, and his business ventures had

greatly and uniformly failed. Tr. 65–66, ECF No. 255. The Debtor did not find employment

until late 2013, making approximately $5,000.00 per month, or $60,000.00 per year, and

allegedly continued to earn that amount through March 2017. *Id.* at 66–67.

124.      Meanwhile, Ms. Chen still consistently earned over $100,000.00 per year working

at Novartis. J. Stip. 3.

125.      In the Debtor's Schedule C, he attempted to claim an exemption to all of the Pension

Plan's assets, pursuant to 11 U.S.C. § 522(d)(10)(E), along with, *inter alia*, all of his cash

on hand that he received from the Divorce Action, the Schring-Plough 401(k) he retained,

and the Merck 401(k) he retained. Pls.' Ex. 15, at 9–11. There were also a number of

retirement assets that were seemingly not disclosed in the Divorce Action. *Compare id.* at

5 (listing all six of the IRA or other pension interests the Debtor held a mere 27 days after

the Divorce Judgment entered) *with* Pls.' Ex. 2, at 19 (listing only four retirement accounts

that the Debtor held).

126.      On August 22, 2018, in its Pension Plan Ruling, this Court sustained the Chapter 7

Trustee's objection to exemption because the Pension Plan violated core qualification

requirements for a retirement plan as set forth in the IRC. *See* ECF No. 557, Case No. 13-

51186. The Court also held that the parties operated LXEng in a fashion solely to benefit

the Debtor and Ms. Chen, which violated Treasury Regulations. *Id.* In so doing, this Court

ruled that the $412,533.40 in funds from the Pension Plan, plus any interest or dividend accruals, were not exempted from the Debtor's Chapter 7 bankruptcy estate. *Id.*

K.  The Suspicious Asset Transfers After the Divorce

127.    Two years after the Divorce Judgment entered, Ms. Chen had not touched the monies in the TD Account to fund living expenses. J. Stip. 4.

128.    Upon commencing the Chen AP on April 8, 2014, the Chapter 7 Trustee also filed an Application for Pre-Judgment Remedy ("PJR Application," ECF No. 2, Adv. Pro. No. 14-05019), seeking to attach and garnish $1,180,970.00 of Ms. Chen's property and assets, in addition to a Motion for Pre-Judgment Disclosure of Property and Assets ("Disclosure Motion," ECF No. 3, Adv. Pro. No. 14-05019). The Court scheduled a hearing on the matters for April 29, 2014 (ECF No. 4, Adv. Pro. No. 14-05019).

129.    Because Ms. Chen worried that her former attorney, Carlos Cuevas ("Attorney Cuevas"), would sue her and could collect from the assets she acquired in the Divorce Action and freeze them, she transferred the money she received from the TD Account ($1,654,234.38) to four different bank accounts unknown to him. Tr. 111–15, ECF No. 253.

130.    In April 2014, on advice from her trial counsel Brian Condon, Ms. Chen removed the money from her TD Account and sent $1.35 million to her parents in China "to protect her money from [Attorney Cuevas]." *Id.* at 115, 160–61; ECF No. 129, Adv. Pro. No. 14-05019.[21]

---

[21] During proceedings before this Court, both Ms. Chen and Brian Condon, trial counsel in this case, acknowledged that he advised Ms. Chen to move the money out of the TD Account. *See* Conn. Bar Ass'n, Informal Op. 91-22 (1991) (discussing the ethics violations of a lawyer who counsels or assists a client to engage in a fraudulent transfer with intent to deceive, delay, or burden creditors).

131.     Despite Ms. Chen's claimed need for monies to support and educate her children, she sent the TD Account funds to China to assure they were outside of the reach of creditors and this Court's jurisdiction. Tr. 115, 161–62, ECF No. 253. This transfer to China occurred after the Chapter 7 Trustee sued her in the Chen AP, *see* ECF No. 1, Adv. Pro. No. 14-05019,  and after Attorney Cuevas sued her for fraud. Tr. 110–13, 153, ECF No. 253.

132.     Ms. Chen's alleged reasons for the transfer to her parents in China have varied over the course of this proceeding and include safeguarding the money from the litigation initiated by Attorney Cuevas to collect his attorney's fees to assisting her parents with the expenses related to unspecified, grave medical conditions that they suffered. *Id.* at 110–13, 153, 161–62. However, she was stunningly unable to address, after the Court inquired, why all of these monies were so transferred, what precise illness(es) and medical treatment(s) her parents required, why she transferred $1.35 million and not some lesser sum, and whether some or all of these funds would be returned. *Id.* at 162–63. Ms. Chen never saw her mother purchase medications nor had she seen any medical bills for her parents' medical treatment. *Id.* at 162–63.

133.     This Count finds her testimony regarding her parental motivations contrived, misleading, and not credible. The Court instead reasonably infers that the Debtor undertook all of these transfers for one purpose: to shield assets from the Debtor's mounting creditors and to protect Ms. Chen from any claimants who might also pursue her.

134.     As this Court previously found, on April 21, 2014, Ms. Chen transferred $50,000.00 to a Bank of China account that her mother held. *See* ECF No. 224, Adv. Pro. No. 14-05019.

135.     On May 5, 2014, the Court granted the PJR Application (ECF No. 13) and the Disclosure Motion (ECF No. 14). That same day, Ms. Chen transferred $250,000.00 to a Bank of China account that her mother held. *See* ECF No. 224, Adv. Pro. No. 14-05019. The following day, she transferred $50,000.00 to a Bank of China account her father held. *Id.*

136.     On May 12, 2014, Ms. Chen made two additional $500,000.00 transfers to accounts held by her parents at the Bank of China, depleting her account by $1,000,000.00 in a single day. *Id.*

137.     Ms. Chen asked the Court to lift its freeze under the Preliminary Injunction Ruling so that she could pay Attorney Condon's legal fees and her son's tuition bill. ECF No. 238, Adv. Pro. No. 14-05019. Based on the totality of the circumstances surrounding the Transfers, her lack of compliance in repatriating the $1.35 million to the United States, and the resulting self-imposed harm, the Court denied that request for relief. ECF No. 245, Adv. Pro. No. 14-05019.

L.  The Credibility of the Witnesses

138.     At trial, the Court learned that Ms. Chen did not inform or provide any documents to her expert witness, retired Judge Zampino, relating to the Dow Action, the Little Action, the Seychelles Action, the Debtor's bankruptcy filing, LXEng's bankruptcy filing, the Medina Letter, the Debtor's bank or brokerage statements, Ms. Chen's bank or brokerage statements, the financial records of the Debtor's businesses, the legal work performed on behalf of the Debtor or his businesses, or Attorney Vengen's deposition testimony, thus, leaving him woefully unfamiliar with many pertinent facts surrounding the PSA and Divorce Action and, consequently, inadequately prepared to testify regarding the fairness

of the PSA and Divorce Action. Tr. 93–97, 107, ECF No. 251. He did not review HGG's financial records or bills or the litigation that they engaged in on the Debtor's behalf. *Id.* at 96–97, 107, 199. However, even without this information, Judge Zampino concluded that the Debtor did not intentionally cause his businesses to spend legal fees to diminish Ms. Chen's share in the Divorce Action based on the evidence. *Id.* at 109–10.

139.    Even though Judge Zampino agreed that support orders are based on the spouse's ability to pay, job availability, and realistic appraisal of the spouse's earning capacity, he failed to properly account for the Debtor's income. *Id.* at 130–32. Judge Zampino's calculation of the Debtor's annual income was skewed by the fact that he averaged the Debtor's annual incomes and included 2010, a year the Debtor received over $1.5 million in income from LXEng, when, in the following year, the Debtor derived only $180,162.00 in income from LXEng, and a mere $275.00 from LXEng in 2012. *See id.* at 62; Pls.' Exs. 72–74.

140.    Like she did with Attorney Siegel and the Superior Court, Ms. Chen intentionally kept her expert in the dark about the Dow Action, the Little Action, the Debtor's bankruptcy filing, and LXEng's bankruptcy filing, which resulted in Judge Zampino being unable to properly analyze whether the Debtor could reproduce his 2010 income. Tr. 93–96, 134–135, ECF No. 251. Instead, he evaluated the Debtor's age and the fact that the Debtor had other clients without lawsuits against him and speculated that the Debtor had the ability to change fields and build up a client base to generate the rough equivalent of his 2010 income in a few years. *Id.* at 132, 136. He conceded that had he known about the Dow Action, it could have impacted his annual income analysis. *Id.* at 138.

141.    Judge Zampino's computation for the Debtor's annual income ($693,000.00), which was used to calculate alimony, was based on an average of the Debtor's income for 2010 ($1,693,667.00), 2011 ($285,000.00), and 2012 ($101,000.00), and included Ms. Chen's $100,000.00 annual income, making it unreliable. *See* Tr. 60, 62–65, ECF No. 251. He overstated the Debtor's income by including Ms. Chen's salary and her 10% distribution from LXEng, and he failed to adjust for Mr. Little's interest in LXEng or Mrs. Little's claim to LXEng's income during those years. *Id.* at 64, 112–13; Tr. 105, ECF No. 248.

142.    Judge Zampino conspicuously failed to offer an opinion on what the outcome of a litigated divorce between the two spouses would have been. Tr. 87–88, ECF No. 251. He reiterated that he was retained only to review the PSA and to testify as to its validity and *bona fides*. *Id.* at 16, 87. He did opine that had the PSA rendered the Debtor insolvent from a balance sheet perspective, then "it would absolutely cause a different outcome" than he had originally concluded. *Id.* at 163.

143.    Judge Zampino claimed that when the Debtor reinvested income into LXEng to preserve its value, it was a dissipation of assets that entitled Ms. Chen to a credit but inconsistently conceded that there was no evidence that the Debtor did this intending to diminish Ms. Chen's share of the marital assets. *Id.* at 115, 117–18. In fact, Ms. Chen, agreeing with the Debtor, testified that she left money in the business for LXEng to reinvest and grow. Tr. 32–38, ECF No. 253.

144.    Judge Zampino included $136,000.00 worth of graduate school costs for the Debtor's children in his college cost calculations, even though he conceded that New Jersey courts rarely calculate and order such. Tr. 71, 74, 146, ECF No. 251. He also failed to

account for PSA § 16, which required the couple's children to apply for all scholarships, student loans, grants, and financial aid available to them and instead calculated college expenses as though Ms. Chen was responsible for every penny because of the family's culture and perceived shame in taking out student loans, despite the PSA's language. *See id.* at 37–38, 70–72, 140–41; Pls.' Ex. 2, at 15. He never investigated whether the couple's son actually requested any financial assistance when he applied for college, as dictated by the PSA. Tr. 142, ECF No. 251.

145.        Judge Zampino's testimony often contradicted itself, and because he was bereft of the PSA's factual context, he failed to support the conclusion that the Debtor and Ms. Chen did not engage in collusion. He admitted that the PSA seemed to indicate that Ms. Chen wanted to secure her economic future on the day that the PSA was executed "and leave the [Debtor] to deal with his future business growth and liability." *Id.* at 153, 159–60.

146.        From their rigid and unresponsive demeanor, the pattern of ostensibly rehearsed and conclusory answers to probing questions, their palpable discomfort upon cross-examination, the general vagueness and evasiveness in their responses upon detailed cross-examination, their often confusing and contradictory replies, and after affording due weight to their unabashed, unapologetic, and continuous course of conduct to shelter assets and avoid creditors, this Court finds that the Debtor and Ms. Chen lacked fundamental credibility and good faith as witnesses.

V.      CONCLUSIONS OF LAW

The Court ADJUDGES, DECREES, and DECLARES the following Conclusions of Law:

A.  Actual Fraudulent Transfers Under 11 U.S.C. § 548

Under Count I of the Chen Complaint, the Chapter 7 Trustee seeks to avoid the Transfers

pursuant to 11 U.S.C. § 548(a)(1)(A). The Bankruptcy Code provides a trustee with the power to

avoid fraudulent transfers with actual intent:

> The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the debtor in
> property, or any obligation (including any obligation to or for the benefit of an
> insider under an employment contract) incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily—
>> made such transfer or incurred such obligation with actual intent to hinder,
>> delay, or defraud any entity to which the debtor was or became, on or after
>> the date that such transfer was made or such obligation was incurred,
>> indebted[.]

11 U.S.C. § 548(a)(1)(A). To establish a prima facie case of an actual fraudulent conveyance, the

trustee must establish actual fraudulent intent. *Christian Bros. High Sch. Endowment v. Bayou No*

*Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 304–05 (S.D.N.Y. 2010). The debtor-

transferor's intent is at issue in such claims, not the transferee's. *Id.* at 304. When making a claim

for a fraudulent transfer, the trustee must prove each element by a preponderance of the evidence.

*Daly v. Richardson (In re Carrozzella & Richardson)*, 302 B.R. 415, 419 (Bankr. D. Conn. 2003).

The purpose underlying the trustee's avoidance powers is namely to prevent asset depletion that

otherwise would have been available to creditors.[22]

---

[22] *See, e.g., Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1060 (9th Cir. 2004) ("11 U.S.C. § 548
seeks to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the
debtor's property.") (citation and internal quotation marks omitted); *Official Comm. of Unsecured Creditors v. Sabine
Oil & Gas Corp. (In re Sabine Oil & Gas Corp.)*, 562 B.R. 211, 225 (S.D.N.Y. 2016) ("In determining whether a
conveyance is fraudulent, [t]he touchstone is the unjust diminution of the estate of the debtor that otherwise would be
available to creditors.") (citation and internal quotation marks omitted).

*1. The Significant Badges of Fraud*

A debtor who "hinders or delays" has "an actual intent to significantly impair a creditor's collection efforts." *Cadle Co. v. Marra (In re Marra)*, 308 B.R. 628, 631 (D. Conn. 2004) (citations omitted). Because of the difficulty in proving actual intent to hinder, delay, or defraud in making its case, a party can rely on the "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank and Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation and internal quotation marks omitted). Since direct evidence of fraudulent intent is rare, "courts infer fraudulent intent by examining the circumstances surrounding the transfer to determine whether any 'badges of fraud' are present." *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 522 (Bankr. D. Conn. 1998) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582 (2d Cir. 1983)). Circumstantial evidence can be used to establish an intent to defraud. *United States v. Federowicz*, 2015 WL 1445092, at *3 (D. Conn. Mar. 30, 2015).

One badge of fraud can "spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud." *In re Colonial Realty Co.*, 226 B.R. at 522 (citing *Acequia v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994) (citation and internal quotation marks omitted)). Here, the Debtor and his wife, Ms. Chen, initiated a material and sustained cascade of fraudulent, evasive, and deceptive activities in the two years preceding the Petition Date. The most telling was the final month before the Petition Date.

Examples of "badges of fraud" include, *inter alia*: (1) concealing facts and false pretenses; (2) an unconscionable discrepancy in consideration received in exchange for the value of the property transferred; (3) creating a closely-held corporation for property receipt; (4) closeness in relationship between the parties; (5) retaining the property in question for benefit or use; (6) the

44

financial condition of the transferor and transferee both before and after the transfer(s);[23] (7) repeated patterns or cumulative effect of courses of conduct post-insolvency or financial troubles; and (8) the timeline of events. *In re Kaiser,* 722 F.2d at 1582–83. The transfer of property to a spouse is a "classic" badge of fraud. *Id.* at 1583 (citation omitted). Asset shifting to different corporate entities wholly owned or "so closely assimilated" by the debtor is an additional badge of fraud. *See Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 218 (1941). Each of the badges of fraud listed above are present here.

Neither the Debtor's nor Ms. Chen's defenses or protestations to the contrary are credible. Without pause or reservation, the Debtor continued conducting business on LXEng's behalf through other entities that he conveniently created. He unabashedly acknowledged that these entities were formed purposefully to keep LXEng's assets out of Mrs. Little's and Dow's hands. The Debtor used his affiliates' foreign bank accounts, as well as his own personal bank account with Ms. Chen and HGG's trust account, to conceal LXEng's assets from these two creditors in particular. The Debtor had one paramount goal: to leave himself and LXEng judgment-proof while channeling their assets to his wife, children, and extended family. His willingness to channel, transfer, and distribute those monies reveals his conscious intention and design. Ms. Chen, aware of the ongoing and increasing avalanche of legal proceedings, facilitated, collaborated, and aided and abetted these transfers, including the Transfers at issue.

Based on the record, it is clear that the Debtor, through his and Ms. Chen's efforts, made the Transfers to hinder, delay, and defraud the Debtor's creditors, including Mrs. Little, Dow, and HGG, within two years of the Debtor's bankruptcy petition filing, and, thus, the Transfers were fraudulent within the meaning of 11 U.S.C. § 548(a)(1)(A).

---

[23] *See e.g., United Gen. Title Ins. Co. v. Karanasos*, 561 B.R. 316, 327–28 (E.D.N.Y. 2016) (holding that the continuing concealment of an asset prevents a Chapter 7 discharge).

B.  Non-Dischargeable Debt Under 11 U.S.C. § 727

Count I of the Dow Complaint asks this Court to deny the Debtor's discharge under 11 U.S.C. § 727(a)(2)(A) based on the Debtor's actions. As laid out, *supra*, the Chapter 7 Trustee has proven that the Debtor made the Transfers in an effort to hinder, delay, and defraud his creditors—and did so mere weeks before his bankruptcy filing.

A discharge shall be granted by the bankruptcy court unless "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, . . . or concealed, or has permitted to be transferred, removed, . . . or concealed . . . property of the debtor, within one year before the date of the filing of the petition[.]" 11 U.S.C. § 727(a)(2)(A). This section of the Bankruptcy Code levies an "extreme penalty," and it, therefore, "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the [debtor]." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (citation and internal quotations marks omitted). To deny a discharge under this section of the Bankruptcy Code, the chapter 7 trustee must prove by a preponderance of the evidence that the property was transferred by the debtor within one year of the bankruptcy petition filing. *Republic Credit Corp. v Boyer (In re Boyer)*, 367 B.R. 34, 43 (Bankr. D. Conn. 2007), *aff'd*, 384 B.R. 44 (D. Conn. 2008), *aff'd*, 328 F. App'x 711 (2d Cir. 2009).

Courts look to "all the surrounding facts and circumstances[,]" where a "continuing pattern of wrongful behavior is one indication of fraudulent intent." 6 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY, ¶ 727.02[3][b], p. 727-18 (16th ed. 2019). If several badges of fraud are present, there is "clear and convincing evidence of actual intent." *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 644 (Bankr. S.D.N.Y. 2009) (citations and internal

46

quotations marks omitted). Here, the specifics of the Divorce Action and the PSA illuminate numerous badges of fraud that warrant relief both under 11 U.S.C. §§ 548 and 727.

### 1. Divorce Action

The division of marital assets during a divorce is a transfer of property and may be successfully challenged by a trustee as a fraudulent transfer under 11 U.S.C. § 548, *see Dobin v. Hill (In re Hill)*, 342 B.R. 183, 196 (Bankr. D.N.J. 2006), or under 11 U.S.C. § 727(a)(2), *see Rogers v. Boba (In re Boba)*, 280 B.R. 430, 434–35 (Bankr. N.D. Ill. 2002). Accordingly, any asset transfer that occurred during the Divorce Action may properly be scrutinized under either statute, as they took place within a month of the Debtor's bankruptcy filing.

### a. PSA Transfers

When a disputed transfer results from a divorce settlement, the courts have considered specific badges of fraud relevant to assess allegations of a "sham" divorce, including:

> The quickly agreed upon split of property, the completion of the divorce proceeding on a "fast-track," the fact that one of the spouses was not represented by counsel in the divorce proceeding, the existence of a short interval between the entry of the divorce decree and the bankruptcy filing, the fact that spouses continue to live together after the divorce in the very house that was transferred to one of the spouses, the fact that the transferor spouse continues to pay the mortgage, taxes, and other costs on the transferred house, the inequitable distribution of debts and assets in the divorce, and the fact that the couple holds themselves out in the public as still being married.

*United States v. Schaudt (In re Schaudt)*, 2012 WL 909299, at *13 (Bankr. N.D. Ill. Mar. 16, 2012) (citations omitted), *aff'd*, 2013 WL 951138 (N.D. Ill. Mar. 11, 2013). "Where a transfer of property is made to a spouse by means of a 'fast-track' divorce on the eve of bankruptcy, this is often evidence of a fraudulent scheme to keep property from creditors." *In re Hill*, 342 B.R. at 196 (citation omitted).

The timing is suspect throughout much of the Debtor's history, but none more so than in the months leading up to the Debtor's Chapter 7 bankruptcy petition filing. The PSA transfers in the couple's fast-track divorce were made for the benefit of the Debtor's family and to hinder the Debtor's substantial creditors. There is weighty proof that the Debtor intended to defraud his creditors.

The Transfers were all made while the Debtor was defending against two sizable lawsuits: the Little Action for $1.5 million and the Dow Action for $15.7 million. This would have been accounted for when determining the Debtor's liabilities and whether indemnification existed for Ms. Chen. Ms. Chen received $2,852,441.00 in assets by virtue of the PSA, $2,384,000.00 of which were not taxable or subject to capital gains taxes. In contrast, the Debtor received $706,272.00 in assets, $676,669.00 of which was subject to ordinary income tax rates plus a 10% penalty for early withdrawals, which the Debtor later attempted to claim as an exemption in his bankruptcy filing. The PSA made no mention as to how the mounting million-dollar liabilities would be treated. Instead, the Debtor and Ms. Chen purposefully shifted around assets that could have been liquidated by Dow and Mrs. Little to escape these creditors and prevent their recovery of the Debtor's assets. The lopsidedness of the PSA reeks of fraudulent intent.

Ms. Chen filed the Divorce Action the day after the District Court ordered a hearing on Dow's Motion for Default Judgment seeking $15.7 million in damages against the Debtor and LXEng. Multiple copies of the Dow Action documents were mailed to the Marital Home during this time. Although Ms. Chen chooses to feign ignorance over the happenings in the Dow Action during the Chen AP, the evidence abounds that she was on actual notice of the litigation in the Dow Action and the adverse course it took against both the Debtor and the couple's business, LXEng. At best, Ms. Chen can only be described as willfully blind to a multimillion-dollar action

affecting a business of which she was a 10% owner. While mail affecting LXEng's continued existence piled up, she pretended to have no idea of the severity of the litigation, which, if it is to be believed, makes a mockery of her duties as a member of LXEng and common sense. Her contentions to the contrary cast further doubt on her credibility. Actually, Ms. Chen knew all along the consequences of her husband's actions, be it through the formal notice sent by Dow and the District Court or through conversations she had with him.

The Divorce Judgment entered a mere three weeks after Ms. Chen's divorce filing without the benefit of formal discovery, asset valuation, or earnest negotiations. A mere 20 days after the Divorce Judgment, LXEng filed for Chapter 7 bankruptcy protection, and a week later, the Debtor filed for Chapter 7 bankruptcy protection. The distribution of marital assets via the PSA was extremely inequitable on its face, as the parties transferred nearly all of their significant liquid assets to Ms. Chen. No due weight or apparent disclosure of the Debtor's potentially multimillion-dollar liabilities to third parties or the effect of LXEng's impending bankruptcy on the Debtor's earning potential appeared in the divorce record. Ms. Chen herself acknowledged that her husband made only $275.00 in the year before the Divorce Action, rather than the $180,000.00 figure indicated in the PSA.

Upon the Court's examination of the record relating to the Divorce Action, the Chapter 7 Trustee has manifestly met his burden of proof—and has done so not just by a preponderance of the evidence, but by clear and convincing evidence—and has shown that the Debtor and Ms. Chen actually intended to hinder, delay, or defraud the Debtor's creditors when the PSA transferred the vast majority of the couple's liquid assets to Ms. Chen within two months of the Petition Date, and that, therefore, the Transfers were actually fraudulent within the meaning of 11 U.S.C. § 548(a)(1)(A).

b.  The Debtor's Insolvency

In April 2013, the Debtor's defense counsel, HGG, withdrew from the Dow Action for lack of payment. In May 2013, the Medina Letter exposed the Debtor's dire financial straits. On June 5, 2013, Dow filed a motion for default seeking $15.7 million in damages against the Debtor and LXEng. On June 11, 2013, the District Court scheduled a hearing for July 30, 2013 on the motion for default.

Ms. Chen filed the Divorce Action the very next day. Neither Ms. Chen nor the Debtor had even met with divorce counsel at this point in time. The Divorce Judgment entered after three weeks, without discovery. Within less than a month of the Divorce Action filing, both the Debtor and LXEng filed for Chapter 7 bankruptcy protection. The Debtor filed for bankruptcy protection on July 30, 2013, a few hours before Dow's motion for default was scheduled for hearing. With party agreement, the Divorce Judgment entered on the very same day that the parties executed the PSA. Attorney Vengen knew they were moving at lightning speed, which was why she never requested or received a retainer from the Debtor. Though Ms. Chen alleges she had contemplated divorce for years, the timing and the speed of the Divorce Action related to the Dow Action are incredibly suspect. Meanwhile, the Debtor claimed he never wanted a divorce because of the cultural shame.

The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). Claim, as defined by the Bankruptcy Code, is a right to payment, even if it is contingent, disputed, or not reduced to judgment. 11 U.S.C. § 101(5). Since claims may be disputed or contingent, they must be included when calculating total indebtedness for purposes of determining insolvency. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 313 (Bankr. S.D.N.Y. 2013); 2 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 101.32[5], p. 101-155 (16th

ed. 2019). Claims are contingent when there is "uncertainty surrounding the likelihood of the triggering event occurring, thus activating the debtor's obligation to pay the creditor[.]" C. Ryan Stewart, *Contingent Liabilities and Disputed Claims in the Context of a Bankruptcy Solvency Analysis*, INSIGHTS, 51, 52 (Winter 2014).

The Bankruptcy Code, Bankruptcy Rules, and case law do not prescribe a uniform or statutory way to calculate contingent claims in bankruptcy proceedings. Alisa H. Aczel, *The Solvency of Mass Tort Defendants: A "Reasonable" Approach to Valuing Future Claims*, 20 Emory Bankr. Dev. J. 531, 539 (2004); Kathryn Ogden Balmforth, Note, *Estimating Contingent Liabilities to Determine Insolvency in Bankruptcy Proceedings:* In re Xonics Photochem., Inc., 1989 BYU L. Rev. 1315, 1318 (1989). Contingent claims must be discounted based on the probability that the contingency will never occur and then multiplied by that probability. *Davis v. Suderov (In re Davis)*, 169 B.R. 285, 302 (E.D.N.Y. 1994); *In re Tronox Inc.*, 503 B.R. at 313. To calculate a disputed claim's value properly, the court must assess their likelihood of success. *Licata v. Coan (In re Licata)*, 2015 WL 9699304, at *7 (D. Conn. Sept. 22, 2015), *aff'd*, 659 F. App'x 704 (2d Cir. 2016).

The record supports a conclusion that the Debtor was insolvent both before and after the Transfers. As the Debtor agreed to make a $1.5 million settlement payment to Mrs. Little to resolve the Little Action, with $300,000.00 due and owing, the Debtor's Schedule F included the $300,000.00 figure as an unsecured claim. The Debtor's Schedule F also indicated he owed HGG $678,000.00 on the Petition Date. However, the Debtor failed to prescribe any numerical value to his liabilities from the Dow Action in his Chapter 7 bankruptcy petition schedules, even though Dow filed an uncontested $15.7 million claim in the Debtor's case. Absent an objection, that claim

is presumptively valid.[24]  Fed. R. Bankr. P. 3001(f). The Debtor not only failed to object, but he admitted that the claim is allowed. Although the Dow claim may have been disputed, contingent, and unliquidated, it still must appear in the balance sheet analysis when calculating the Debtor's insolvency, with the claim's proper valuation remaining the sole issue. *See In re Xonics Photochem., Inc.*, 841 F.2d 198, 200 (7th Cir. 1988); *Estimating Contingent Liabilities*, 1989 BYU L. Rev. at 1323.

The Court finds by clear and convincing evidence that the Debtor would have been liable in some way to Dow either through default, judgment,[25] or settlement. Where "a contingent liability is both probable[ and capable of reasonable estimation, it must be accrued[.]" *Estimating Contingent Liabilities*, 1989 BYU L. Rev. at 1329 (citing ACCOUNTING FOR CONTINGENCIES, Statement of Financial Accounting Standards No. 5 § 8 (Fin. Accounting Standards Bd. 1986)). At the time of the bankruptcy filing, the District Court had disqualified the Debtor's key expert witness with its *Daubert* order, thus, striking a significant blow to the Debtor's likelihood of success on his claims. HGG withdrew from representing the Debtor in the Dow Action, and Attorney Medina indicated to the District Court that the Debtor intended to file bankruptcy on the verge of a default judgment. The substantial likelihood of an unsuccessful defense continued to mount against the Debtor, while the continued litigation itself was an unsustainable expense, as Ms. Chen knew. The Debtor had already accumulated $678,000.00 in legal fees that he had failed to pay, in addition to the $2.9 million HGG had previously held in reserves for legal fees. While the Debtor may not have been found liable for the entire $15.7 million sum, even by the most

---

[24] Importantly, where there is no objection to a proof of claim, it is deemed allowed in a bankruptcy case. 11 U.S.C. § 502(a).
[25] The District Court had already entered default judgment against LXEng in 2014 and had stayed its decision on whether it would disgorge the $15.7 million Dow sought from LXEng. The only reason the District Court has not ruled on the motion for default judgment against the Debtor is because the proceeding is currently stayed by the Debtor's bankruptcy filing.

deferential standard, it is more likely than not that either through default, continued litigation, or settlement, the Debtor, like his codefendants in the Dow Action, would have sustained a substantial liability to Dow.

The Debtor knew since 2012 that LXEng's money was dwindling, and the Medina Letter admitted as such. His financial outlook, which was inextricably tied to LXEng, only continued to worsen as time wore on. By every stretch of the imagination, the Debtor was insolvent prior to the PSA and Divorce Judgment and only became further insolvent by the grossly uneven PSA distributions.

### c.  Calculating Debtor's Income

If the Debtor indicated that he was underemployed during the Divorce Action, the Superior Court would have imputed income to him based on appraising the Debtor's earning potential and the job market. *See Storey v. Storey*, 373 N.J. Super. 464, 474 (App. Div. 2004). During the best of times, the Debtor earned approximately $180,000.00 per year. While at times he received hefty distributions from LXEng, these trumped up profits resulted from the misuse of Dow's technology. This Court's Pension Plan Ruling further elaborates on the inequity that occurred both between the Debtor and Ms. Chen and their treatment of LXEng.

### i. Concealing Assets

The parties' attempt to conceal the transfer of their marital assets from judgment creditors provides evidence for yet another badge of fraud and further shows the debtor's intent to conceal. *See In re Hill*, 342 B.R. at 199–200. When all was said and done, the parties sought to conceal their transfers under the PSA. Both the Debtor and Ms. Chen asked the Superior Court not to include the PSA with the Divorce Judgment, which the judge denied.

The PSA was not the Debtor's first move in shielding assets from Dow and Mrs. Little. He admitted that he used offshore bank accounts and solely-owned companies to shield his assets from his creditors. Intelligent Solar was the only company he formed that had an owner other than himself—and that was his then-wife, Ms. Chen. He invested over $700,000.00 into Intelligent Solar. He frequently placed money in other people's hands, including HGG and his then-wife, Ms. Chen, to keep it out of his own. His course of conduct was designed to frustrate and disrupt creditors' ability to collect should they come calling. The Divorce Action was his last desperate attempt to keep his assets away from his creditors, all with the help of Ms. Chen.

ii. Insider Status

The Debtor and Ms. Chen are insiders of LXEng, and they are insiders to each other. At the time they mutually agreed to the PSA Transfers, the Debtor and Ms. Chen had been married for more than 20 years and had two children together. Their children, who also qualify as insiders under the Bankruptcy Code, were the beneficiaries of the PSA. *See* 11 U.S.C. §§ 101(31)(A)(i), (45); *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Debtor and Ms. Chen cherrypicked which assets would be exempt and non-exempt when dividing their possessions during the Divorce Action, all in an effort to keep them away from the Debtor's creditors. Although the Debtor claims one of the purported purposes was to ensure financial security for the couple's children, including payment of their future college expenses, neither of the children were college-aged. The division of assets was grossly disproportionate and lacked consideration. The Debtor received assets in which he largely claimed exemptions.

The transactions that occurred between the Debtor and Ms. Chen were surrounded by suspicious timing and behaviors. When coupling these behaviors with their deliberate asset

movement to shield the Debtor from his mounting liabilities, it is clear to the Court that their entire course of conduct was intended to defraud the Debtor's creditors by any standard of proof.

### iii. Lack of Consideration

Fraud also exists "when the value of the consideration received by the debtor is not reasonably equivalent to the value of the asset transferred." *In re Hill*, 342 B.R. at 200. However, "the relevant inquiry is not simply whether [the debtor] received consideration, but whether that consideration was in a form available for execution by creditors, *i.e*[,] an assessment of the extent to which such creditors were deprived of the value of the diverted property." *Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R. 552, 559 (Bankr. D. Conn. 2004). In reviewing a divorce settlement, courts must make a "surface determination . . that the division of marital property between the divorcing parties was within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated in that state court." *Harman v. Sorlucco (In re Sorlucco)*, 68 B.R. 748, 753 (Bankr. D. N.H. 1986) (internal quotations marks omitted). Even where a *bona fide* divorce has occurred, there are times when "the transferor nonetheless favors transferring assets to the ex-spouse rather than seeing them go to a creditor body. Although the divorce may be valid, the same may not hold true for the division of marital property." *In re Hill*, 342 B.R. at 196.

The Debtor and Ms. Chen concocted the PSA without the input of counsel or the benefits of discovery and litigation. They employed counsel merely to file the legal papers and bless the PSA. Where unrepresented divorcing spouses collude in transferring their marital assets, it provides further evidence of intent to defraud creditors. *See In re Boba*, 280 B.R. at 432–36.

Had the PSA been litigated in the New Jersey state court, the outcome and distribution would have significantly differed, as the Chapter 7 Trustee's expert established. The bank account

55

distribution would have differed substantially. The college expenses would have been paid by both parents as they became due, and variables such as tuition, fees, books, housing prices, and scholarship receipts would have been considered rather than paying for them all in one lump sum well before either child stepped foot onto a college campus.

Ms. Chen's asserted defenses do not hold water. Both the Debtor and Ms. Chen are highly educated actors. They knew exactly what they were doing and worked in concert. Both Ms. Chen and the Debtor lacked fundamental credibility, as did Ms. Chen's expert witness. Ms. Chen simply cannot support her good faith defense that she took the marital assets for value. Ms. Chen was fully aware of the Debtor's and LXEng's financial distresses leading up to the Divorce Action. At that time, she was still one of only two board members of LXEng, the other being her husband, the Debtor. Conscious avoidance or disregard of the Dow Action is not an excuse. *See Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 449–50 (Bankr. S.D.N.Y. 2011). Ms. Chen received LXEng's mail regarding the Dow Action to the Marital Home and collected it. She knew Mrs. Little sought payment from her husband since Mr. Little's death. She knew creditors could take money from their shared marital accounts. She knew she would be unable to collect alimony if the Debtor lost the Dow Action.

Debtor's counsel would like to spin the lack of financial disclosures during the Divorce Action as appropriate because Ms. Chen knew of her husband's financial condition. Financial disclosure was still ordinary under the circumstances and indicated by the Debtor's history. However, this Court views the lack thereof as additional evidence that Ms. Chen knew exactly the types of problems that the Debtor had and the trouble he was in at the time of the Divorce Action. This is why she helped structure the grossly disproportionate division of marital assets. It is why she removed $1.35 million to China to shield it from her then-husband's creditors and the Chapter

7 Trustee. The PSA meant to transfer all of the couple's non-exempt assets to Ms. Chen to preserve the value for their family, rather than to fairly fund any liabilities the Debtor faced.

VI.   CONCLUSIONS

The Court hereby **ADJUDGES, DECREES, AND DECLARES** that:

1) As to Chen AP Count I, as it pertains to actual fraudulent transfers, the Chapter 7 Trustee has met his burden of proof by clear and convincing evidence to warrant the relief requested under 11 U.S.C. § 548(a)(1)(A). The Debtor transferred substantial amounts of money and assets to his then-wife, Ms. Chen, in an attempt to avoid his creditors, committing actual fraudulent transfers avoidable under 11 U.S.C. § 548(a)(1)(A).

2) As to Dow AP Count I, as it pertains to discharge entitlement, Dow has met its burden of proof by clear and convincing evidence to warrant the relief requested under 11 U.S.C. § 727(a)(2)(A). The Debtor transferred substantial amounts of money and assets to his then-wife Ms. Chen in an intentional scheme to avoid the Debtor's creditors and permitted Ms. Chen to remove the property to China, thus prohibiting the Debtor from receiving a discharge under 11 U.S.C. § 727(a)(2)(A).

3) The Chapter 7 Trustee has established that Ms. Chen was not a mere conduit, but that she had full dominion and control over the Transfer funds and assets and was able to put them to her uses, as she did when she transferred $1.35 million to China, thus warranting the relief requested under 11 U.S.C. § 550(a). Ms. Chen is liable to the Chapter 7 Trustee for the $986,581.33 in Transfers, and the Chapter 7 Trustee may recover the value of the Transfers from her as damages pursuant to 11 U.S.C. § 550(a).

4) In the Chen AP, judgment shall enter in favor of the Chapter 7 Trustee and against Ms. Chen in the amount of $986,581.33, plus interest, fees, and costs as allowed by law.

5) In the Dow AP, judgment shall enter in favor of Dow and against the Debtor, denying the Debtor his discharge under 11 U.S.C. § 727(a)(2)(A).

6) In the Chen AP, the terms of the Preliminary Injunction Ruling shall remain in force and effect until further order of this Court. Any application for permanent injunctive relief or relief therefrom shall be filed and served within 21 days of the date of this Decision and shall be scheduled for expedited consideration by this Court.

7) In the interests of fairness, equity, and justice, the Court waives the 14-day stay of this Decision imposed by Fed. R. Bankr. P. 7062. Delays in execution on this judgment only further a fraud upon this Court and the Debtor's Chapter 7 bankruptcy estate through the prospect of asset dissipation.

This Decision constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052. In these Adversary Proceedings, separate judgments shall enter simultaneously with the docketing of this Decision. The Clerk is ordered to schedule a status conference within 15 days hereof with mandatory attendance by the parties and their respective legal counsel.

**IT IS SO ORDERED** at Hartford, Connecticut on this 30th day of August 2019.



James J. Tancredi
United States Bankruptcy Judge
District of Connecticut